**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**Case No.: _____**

IAN B. FREEMAN, SHIRE FREE CHURCH
MONADNOCK, MALAISE LINDENFELD,
PHO KEENE GREAT LLC, ARIA
DIMEZZO, ARIA DIMEZZO (d/b/a
REFORMED SATANIC CHURCH),

       Plaintiffs,

vs.

CITY OF KEENE,
GOVERNOR CHRISTOPHER T. SUNUNU,
in his official and individual capacities,

       Defendants.

_____

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT,**
**INJUNCTIVE RELIEF, AND DAMAGES[1]**

      Plaintiffs Ian B. Freeman, Shire Free Church Monadnock, Malaise Lindenfeld, Pho

Keene Great LLC, Aria DiMezzo, and Aria DiMezzo (d/b/a Reformed Satanic Church), bring

this Verified Complaint for Declaratory Judgment, Injunctive Relief, and Damages against

Defendants City of Keene and Governor Christopher T. Sununu, in his official and individual

capacities, to challenge (1) the City of Keene's enactment of an ordinance (O-2020-09-A)[2]

requiring individuals who enter any business, who are present in any outdoor area serviced by a

business, or who enter or are present in the common areas of any business, or in the common

areas of any residential building with three or more units, to wear face masks or coverings, and

(2) Governor Sununu's Emergency Order #63, which requires face coverings for certain

_____

[1] Plaintiffs are filing contemporaneously with this Complaint a Motion for a Temporary Restraining Order and/or
Preliminary Injunction.
[2] https://ci.keene.nh.us/sites/default/files/Community%20Development/covid19/Mask%20Ordinance%20O2020-
09A%2020200806.pdf

scheduled gatherings of 100 or more individuals.  Plaintiffs also seek relief, including damages, for violation of their Constitutional rights.

## **INTRODUCTION**

1.      In the famous United States Supreme Court case, *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court held the state of New Hampshire could not constitutionally require an individual to display the motto "Live Free or Die" on a license plate because it violated an individual's right under the First Amendment to hold a different point of view.  *Id.* at 714-15.  It was, indeed, ironic that a state whose motto was (and still is) "Live Free or Die" would compel individuals, under the threat of criminal prosecution, to drive around with license plates depicting the motto "Live Free or Die."  Plaintiffs, like many individuals in Keene and throughout New Hampshire, wish to live free of such arbitrary mandates.

2.      The New Hampshire state government, however, has ignored these requirements since the outbreak of the Coronavirus.  Invoking a feigned "public health" crisis under an unconstitutional delegation of legislative power, Governor Sununu exceeded his statutory emergency powers, swept aside Plaintiffs' (and others') Constitutional rights, and – along with other state agencies and municipalities (like the City of Keene) – has attempted to control and regulate nearly every instance of individuals' daily lives.  Since March 2020, the Governor issued several executive and emergency orders that forced individuals to stay home, shut down businesses and the school year, and directed individuals in certain gatherings of 100 or more to wear face coverings, under the guise of "social distancing" requirements and other mitigation measures in response to the Coronavirus and in the name of preserving the public health of the population in the state.

3.      "There is no pandemic exception" to Plaintiffs' Constitutional rights.  *Berean Baptist Church v. Governor Roy A. Cooper, III*, No. 4:20-CV-81-D, at *2 (E.D.N.C. May 16, 2020).  "***The Constitution is not suspended when the government declares a state of disaster.***" *In re Salon a la Mode, et al.*, No. 20-0340, at *3 (Tex. May 5, 2020) (Blacklock, J., concurring) (quoting *In re Abbott*, No. 20-0291, 2020 WL 1943226, at *1 (Tex. Apr. 23, 2020)) (emphasis added).  "Government power cannot be exercised in conflict with the[] constitution[], even in a pandemic.'" *In re Salon a la Mode, et al.*, No. 20-0340, at *3 (emphasis added).  "***[A]ll of us – the judiciary, the other branches of government, and our fellow citizens – must insist that every action our governments take complies with the Constitution, especially now.***  If we tolerate unconstitutional government orders during an emergency, whether out of expediency or fear, we abandon the Constitution at the moment we need it most." *Id.* (emphasis added)

4.      Although the government may undertake actions "in a well-intentioned effort to protect" its citizens, "good intentions toward a laudable end are not alone enough to uphold governmental action against a constitutional challenge." *Cnty. of Butler v. Wolf*, Civil Action No. 2:20-cv-677, at *2 (W.D. Pa. Sep. 14, 2020).  "Indeed, the greatest threats to our system of constitutional liberties may arise when the ends *are* laudable, and the intent *is* good—especially in a time of emergency. In an emergency, even a vigilant public may let down its guard over its constitutional liberties only to find that liberties, once relinquished, are hard to recoup and that restrictions—while expedient in the face of an emergency situation—may persist long after immediate danger has passed." *Id.*

5.      "Any government that has made the grave decision to suspend the liberties of a free people during a health emergency should welcome the opportunity to demonstrate – both to its citizens and to the courts – that its chosen measures are absolutely necessary to combat a

threat of overwhelming severity.  The government should also be expected to demonstrate that less restrictive measures cannot adequately address the threat. . . .  ***When the present crisis began, perhaps not enough was known about the virus to second-guess the worst-case projections motivating the lockdowns.  As more becomes known about the threat and about the less restrictive, more targeted ways to respond to it, continued burdens on constitutional liberties may not survive judicial scrutiny.***"  *In re Salon a la Mode, et al.*, No. 20-0340, at \*3 (emphasis added).

6.     Indeed, even under the standard articulated in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the United States Supreme Court cautioned that "the police power of a state . . . may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression."  *Cnty. of Butler*, Civil Action No. 2:20-cv-677, at \*13 (quoting *Jacobson*, 197 U.S. at 38).  In other words, "a public health measure may violate the Constitution."  *Cnty. of Butler*, Civil Action No. 2:20-cv-677, at \*13.  The Court has since established different tiers of Constitutional scrutiny separate from *Jacobson* because that decision was too "permissive" and "float[ed] about the air as a rubber stamp for all the most absurd and egregious restrictions on constitutional liberties."  *Cnty. of Butler*, Civil Action No. 2:20-cv-677, at \*14 (quoting *Bayley's Campground*, *Inc*. *v*. *Mills*, ___ F. Supp. 3d ___, 2020 WL 2791797, at \*8 (D. Me. May 29, 2020)).  The Court in *County of Butler* concluded the "extraordinarily deferential standard based on *Jacobson* is not appropriate."  *Id.* at \*17.  In a situation where government officials "are statutorily permitted to act with little, if any, meaningful input from the legislature," "[f]or the judiciary to apply an overly deferential standard would remove the only meaningful check on the exercise of power."  *Id.* at \*21.

7.      "[A] public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." *Cnty. of Butler*, Civil Action No. 2:20-cv-677, at *15 (quoting *Calvary Chapel Dayton Valley v. Sisolak*, ___ U.S. ___, 2020 WL 4251360 (Jul. 24, 2020) (Alito, J., dissenting).

8.      New Hampshire, like many states, is confronting this question.  While Governor Sununu's orders in March 2020 responded to an emerging pandemic about which we had limited information, New Hampshire no longer has an "emergency," or even a threat of one, that justifies the continued restrictions on its citizens and economy.  "Emergency" measures that appeared to be Constitutionally appropriate in March are less appropriate now, given the wealth of information available that demonstrates New Hampshire's healthcare system never came close to reaching capacity, and the Coronavirus is not as deadly as previously feared.

9.      In addition to these state-wide concerns, the City of Keene proceeded even further than the Governor by passing an ordinance requiring all individuals who enter or patronize businesses, or who enter the common areas of residential buildings of three or more units, to wear face masks or coverings.  In doing so, the City ignored or abused certain procedural requirements.  The City lacked the statutory authority to enact such an ordinance, and it is preempted by Governor Sununu's numerous emergency orders (assuming they are valid, which Plaintiffs do not concede) regulating the state's response to the Coronavirus.  Despite these limitations, the City adopted this ordinance.  It is overbroad and violates several of Plaintiffs' (and other citizens') constitutional rights.

10.    Plaintiffs, among other remedies, principally seek a declaratory judgment and injunctive relief stating that the City's ordinance (O-2020-09-A) and Emergency Order #63 are null and void for the reasons stated above and explained further below.

## PARTIES

11.    Plaintiff Ian B. Freeman is an individual who is a resident of New Hampshire and who is the Chairman of the Board of Directors of Shire Free Church Monadnock, a Domestic Nonprofit Corporation, with an address of 73 & 75 Leverett St., Keene, New Hampshire 03431. Shire Free Church also operates Bitcoin Embassy NH at 661 Marlboro Street, Keene, New Hampshire 03431.

12.    Plaintiff Shire Free Church Monadnock is a Domestic Nonprofit Corporation with the address identified above.

13.    Plaintiff Malaise Lindenfeld is an individual who is a resident of New Hampshire and who owns and operates Pho Keene Great, LLC, a New Hampshire Limited Liability Company with a principal place of business at 11 Main Street, Keene, New Hampshire 03431.

14.    Plaintiff Pho Keene Great is a New Hampshire Limited Liability Company with the principal place of business identified above.

15.    Plaintiff Aria DiMezzo is an individual and a resident of New Hampshire.  She owns the trade name "Reformed Satanic Church," which operates at 659 Marlboro Road, Keene, New Hampshire 03431.  (According to the New Hampshire Department of State, the trade name is registered to James Baker.  Mr. Baker changed his name to "Aria DiMezzo."  They are the same person.)

16.    Defendant City of Keene is a municipal corporation with a business address of 3 Washington Street, Keene, New Hampshire 03431.

17.     Defendant Christopher T. Sununu is the Governor of New Hampshire and is being sued in his official and individual capacities.  The Governor's address is 107 North Main Street, Concord, New Hampshire 03301.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over Plaintiffs' claims for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1367(a), and Federal Rule of Civil Procedure 57.

19.     This Court also has subject matter jurisdiction over Plaintiffs' constitutional claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (jurisdiction over claims arising under federal civil rights statutes).

20.     The Court has personal jurisdiction over the Defendants because they are located in New Hampshire, and their conduct occurred in New Hampshire.

21.     This Court also has pendant/supplemental jurisdiction under 28 U.S.C. § 1367(a) over any state law claims herein.

22.     Venue is proper in this District because all the parties conduct business in this District, all of the acts alleged occurred in New Hampshire, and all the parties reside in New Hampshire.

## FACTUAL ALLEGATIONS

**A.     Keene's Adoption of a City Charter**

23.     Mr. Freeman is a radio talk show host, a minister, and an ambassador at Bitcoin Embassy NH.  Mr. Freeman's talk show ("Free Talk Live") is broadcast from Keene, NH.  It is syndicated on over 200 radio stations and two television stations across the United States.

24.     Ms. Lindenfeld is an immigrant from Venezuela.  Her parents fled Cuba for
Venezuela after Fidel Castro's revolution in 1959 ushered in Cuba's current period of oppressive
communist and totalitarian rule.  Ms. Lindenfeld came to the United States in 1979 on a student
visa.  She married an American citizen in 1983 and obtained a green card in 1984.  She attended
school and completed the culinary program at the New York Restaurant School in 1989.  Ms.
Lindenfeld moved to New Hampshire part-time in 1999 and permanently settled there in 2003.
In New Hampshire, she transformed her passion for food into a career as a restaurant owner and
small business owner.  Ms. Lindenfeld successfully opened and operated three restaurants in
Cheshire County: Audrey's Café in Dublin, Piedra Fina in Marlborough, and Pho Keene Great in
Keene.  The first two of those three restaurants closed permanently earlier this year due to
Governor Sununu's Emergency Orders shutting down restaurants.  Ms. Lindenfeld opened Pho
Keene Great in March 2019.  It is a Vietnamese restaurant that primarily serves the Vietnamese
soup "pho," a popular soup consisting of broth, rice noodles, herbs, and meat.  It is a popular
street food in Vietnam and served in restaurants around the world.

25.     Ms. DiMezzo is originally from Mississippi and is a writer and author of two
books, and – recently – the GOP nominee for the New Hampshire Cheshire County Sheriff.

**B.     Keene's Adoption of a City Charter**

26.     Various authorities dictate what subject areas cities may govern and how they can
govern those areas.

27.     Cities may implement their chosen form of government through the adoption of a
"city charter."  Part I, Article 39 of the New Hampshire Constitution states "[t]he legislature may
by general law authorize cities and towns to adopt or amend their charters or forms of
government in any way which is not in conflict with general law, provided that such charters or

amendments shall become effective only upon the approval of the voters of each such city or town on a referendum."

28.     This power is known as the "home rule power," and it is "a vehicle whereby a municipality may adopt a form of government that best addresses local needs."  RSA 49-B:1. The legislature recognized, however, that there must be "uniform procedures and practices when there is a corresponding state interest."  *Id.*  This "home rule power" does not "create any power in, or confer any power upon, any city or town beyond that necessary to carry out the amendment of a charter or form of government as set forth in this chapter."  *Id.*  A city may "adopt, amend, or revise a municipal charter relative to their form of government ***so long as the resulting charter is neither in conflict with nor inconsistent with the general laws or the constitution of this state***."  *Id.* (emphasis added).  If a proposed charter "denominates the municipality as a city, the charter shall be prepared pursuant to RSA 49-C."  RSA 49-B:2, III.

29.     RSA 49-C:1, in turn, "implement[ed]" Part I, Article 39 of the New Hampshire Constitution by "enabling municipalities to draft city charters within the framework of the statute without need for creating special charters by action of the general court."  Cities are required to file these charters with the Secretary of State.  RSA 44:1-a.

30.     Keene adopted its City Charter in 1970.[3]  It amended its Charter numerous times, including under the framework established above.[4]  This Charter establishes the City's form of government.

**B.     The Limits on Keene's Enactment of Legislation**

31.     Keene's "legislation shall be by ordinance."  RSA 49-C:14; Charter § 23.

---

[3] https://ci.keene.nh.us/my-city-government/keene-city-charter
[4] *See id.*

32.     The ordinances a city may enact, however, are limited to what its enabling statutes prescribe.  RSA 44:1 states "[a]ll cities now or hereafter incorporated shall have, exercise and enjoy all the rights, immunities and privileges of, and shall be subject to all the duties incumbent upon, or appertaining to, the town corporations to which they succeed."  RSA Chapter 31, which identifies the powers and duties of towns, was made to apply to cities as well: "All provisions of statutes, now made or hereafter enacted relating to towns, shall be understood to apply to cities; and all provisions relating to the selectmen and town clerks of towns shall be construed to apply to the mayor and aldermen and clerks of cities, respectively, unless a different intention appears."  RSA 44:2; *see also Girard v. Town of Allenstown*, 121 N.H. 268, 269 (1981) (RSA 31:39 . . . delegates certain general police powers to the towns and municipalities within the State.").

33.     RSA 31:39 (titled "Power to Make Bylaws") provides what kinds of bylaws towns (and, by extension, cities) may enact.  RSA 47:17 (titled "Bylaws and Ordinances") identifies what kinds of bylaws and ordinances cities may enact through their city councils.  (A city governs through a "city council," which is comprised of a "mayor, board of aldermen, and common council."  RSA 44:3.)

34.     In *Girard*, the New Hampshire Supreme Court labeled the powers identified in RSA 31:39 a town's "police power" and explained, "[a]lthough th[is] police power is broad and has been described as including 'such varied interests as public health, safety, morals, comfort, the protection of prosperity, and the general welfare, it is not unlimited.'"  121 N.H. at 270 (internal citation omitted).  "[T]owns only have 'such powers as are *expressly granted* to them by the legislature and such as are *necessarily* implied or incidental thereto.'"  *Id.* at 270-71 (quoting *Piper v. Meredith*, 110 N.H. 291, 295 (1970)) (emphases in original).

35.     With respect to city councils, these limits are contained in RSA 49-C:15: A city

council "shall have all the powers and discharge all the duties conferred or imposed upon" it "by

RSA 44 through RSA 48 or other general law now in force or later enacted."  RSA 49-C:15.

36.     Accordingly, RSA 31:39 provides the specific subject areas about which towns

(and cities) may enact laws:

> (a) The care, protection, preservation and use of the public cemeteries, parks, commons, libraries and other public institutions of the town;
> (b) The prevention of the going at large of horses and other domestic animals in any public place in the town;
> (c) The observance of Memorial Day, whereby interference with and disturbance of the exercises for such observance, by processions, sports, games or other holiday exercises, may be prohibited;
> (d) Regulation of the use of mufflers upon boats and vessels propelled by gasoline, oil or naphtha and operating upon the waters within the town limits;
> (e) The kindling, guarding and safekeeping of fires, and for removing all combustible materials from any building or place, as the safety of property in the town may require;
> (f) The collection, removal and destruction of garbage, snow and other waste materials;
> (g) Regulating the operation of vehicles, except railroads as common carriers, upon their streets;
> (h) Regulating the conduct of public dances;
> (i) Regulating the conduct of roller skating rinks;
> (j) Regulating the sanitary conditions of restaurants within town limits in accordance with the provisions of RSA 147:1;
> (k) Issuing a license for the operation of a restaurant and other food serving establishments within the town limits and charging a reasonable fee for same;
> (*l*) Making and ordering their prudential affairs;
> (m) Issuing permits for tattooing facilities and charging a fee for the permit; and
> (n) Regulating noise.
> (o) Requiring the reporting of contributions to, and expenditures by, any candidate or political committee made for the purpose of influencing the election of any candidate for local elective office, or any person or committee for the purpose of influencing the vote on any local ballot or referendum question.
> (p) Regulating the retail display and accessibility of martial arts weapons including throwing stars, throwing darts, nunchaku, blow guns, or any other objects designed for use in the martial arts that are capable of being used as lethal or dangerous weapons.

RSA 31:39, I(a)-(p).

37.     RSA 47:17 also provides the specific subject areas about which cities may enact

ordinances:

I. In General. To carry into effect all the powers by law vested in the city.
II. Order and Police Duty. To regulate the police of the city; to prevent any riot,
noise, disturbance, or disorderly assemblages; to regulate the ringing of bells,
blowing of horns or bugles, and crying goods and other things; and to prescribe
the powers and duties of police officers and watchmen.
III. Disorderly Houses and Gaming. . . .
IV. Sale of Liquor. . . .
V. Shows. To regulate or prohibit the exhibitions of natural or artificial
curiosities, caravans, circuses, theatrical performances, or other shows.
VI. Porters, Vehicles, Etc. . . . .
VII. Use of Public Ways. To regulate all streets and public ways, wharves, docks,
and squares, and the use thereof, and the placing or leaving therein any carriages,
sleds, boxes, lumber, wood, or any articles or materials, and the deposit of any
waste or other thing whatever; the removal of any manure or other material
therefrom; the erection of posts, signs, steps, public telephones, telephone booths,
and other appurtenances thereto, or awnings; the digging up the ground by traffic
thereon or in any other manner, or any other act by which the public travel may be
incommoded or the city subjected to expense thereby; the securing by railings or
otherwise any well, cellar, or other dangerous place in or near the line of any
street; to prohibit the rolling of hoops, playing at ball or flying of kites, or any
other amusement or practice having a tendency to annoy persons passing in the
streets and sidewalks, or to frighten teams of horses within the same; and to
compel persons to keep the snow, ice, and dirt from the sidewalks in front of the
premises owned or occupied by them.
VIII. Traffic Devices and Signals. . . .
IX. Combustibles. . . . .
X. Stock at Large. To regulate, restrain, or prohibit the keeping or running at large
of horses, cattle, sheep, swine, geese, goats and other poultry and animals, or any
of them, to create the limits of districts within which the same may be kept and
the conditions and restrictions under which they may be kept.
XI. Dogs. . . . .
XII. Markets, Sales. To establish markets and market-places; regulate the place
and manner of selling and weighing hay, selling pickled and other fish, and salted
and fresh provisions; selling and measuring wood, lime, coal, and other heavy
articles; and to appoint suitable persons to superintend and conduct the same; to
prevent and punish forestalling and regrating; and to restrain every kind of
fraudulent device and practice.
XIII. Vagrants, Obscene Conduct. To restrain and punish vagrants, mendicants,
street beggars, strolling musicians, and common prostitutes, and all kinds of
immoral and obscene conduct, and to regulate the times and places of bathing and
swimming in the canals, rivers and other waters of the city, and the clothing to be
worn by bathers and swimmers.

XIV. Nuisances. To abate and remove nuisances; to regulate the location and construction of slaughterhouses, tallow chandlers' shops, soap factories, tanneries, stables, barns, privies, sewers, and other unwholesome or nauseous buildings or places, and the abatement, removal or purification of the same by the owner or occupant; to prohibit any person from bringing, depositing, or having within the city any dead carcass or other unwholesome substance; to provide for the removal or destruction, by any person who shall have the same upon or near such person's premises, of any such substance, or any putrid or unsound beef, pork, fish, hides, or skins, and, on such person's default, to authorize the removal or destruction thereof by some officer of the city; to authorize and provide for the collection, removal, and destruction of garbage and other waste material, to make necessary regulations relative thereto, and to provide for payment therefor by assessment, or appropriation, or both. . . .

XIV-a. Interfering With Voters. . . .

XIV-b. Local Election Reporting Requirements. . . .

XV. Miscellaneous. Relative to the grade of streets, and the grade and width of sidewalks; to the laying out and regulating public squares and walks, commons, and other public grounds, public lights, and lamps; to trees planted for shade, ornament, convenience, or use, and the fruit of the same; to trespasses committed on public buildings and other public property, and in private yards and gardens; in relation to cemeteries, public burial grounds, the burial of the dead, and the returning and keeping records thereof, and bills of mortality, and the duties of physicians, sextons and others in relation thereto; relative to public wells, cisterns, pumps, conduits, and reservoirs; the places of military parade and rendezvous, and the marching of military companies with music in the streets of the city; relative to precautions against fire; relative to oaths and bonds of city officers, and penalties upon those elected to such offices refusing to serve; and relative to licensing and regulating butchers, petty grocers, or hucksters, peddlers, hawkers, and common victualers; dealers in and keepers of shops for the purchase, sale or barter of junk, old metals or second-hand articles, and pawnbrokers; under such limitations and restrictions as to them shall appear necessary. . . .

XVI. Warnings and Citations. To establish a procedure for the issuance of warnings and citations for the violation of health, fire, planning board, building, licensing, zoning, and housing codes and ordinances.

XVII. Drug-Free Zones. Establish as a drug-free zone any area inclusive of public housing authority property and within 1,000 feet of such public housing authority property. . . .

XVIII. Automobile Parking Controls. . . .

XIX. Businesses Obtaining City Permits. . . .

RSA 47:17, I-XIX.

38.     RSA 47:17, XV states that, although a city "may make any other bylaws and regulations which may seem for the well-being of the city; . . . no bylaw or ordinance shall be repugnant to the constitution or laws of the state."

39.     The penalty for a violation of any municipal laws passed pursuant to RSA 31:39, I, or RSA 47:17 may include a fine of up to $1,000.  RSA 31:39, III; RSA 47:17.

40.     None of the areas in the authorities above permits municipalities to enact legislation requiring that individuals wear face coverings or face masks, let alone any legislation concerning what anyone may or may not wear.  Further, nothing in Title X ("Public Health"), RSA Chapters 125-149-Q, permits municipalities to enact similar legislation.  Indeed, there is no New Hampshire statute, rule, or regulation that permits municipalities to enact that kind of legislation.

**C.     Keene's Form of Government**

*City Council and Mayor*

41.     Keene's City Charter states "all the powers of the City shall be vested in a City Council composed of two (2) Ward Councilors from each ward."  Charter § 18.

42.     "The Mayor shall be the official head of the City for all ceremonial purposes," "shall preside at all meetings of the City Council" but "shall have no power to vote, except in the case of a tie."  *Id.* § 19.  "All other duties of the Mayor prescribed by law shall be exercised by the City Manager."  *Id.*

43.     "The City Council . . . shall have all the powers and discharge all the duties conferred or imposed upon City Councils in convention, City Councilors voting concurrently, or Board of Mayor and Alderman acting separately."  *Id.* § 22.  The Council shall also "have the powers of Selectmen of towns."  *Id.*

44.     Before it may enact a new ordinance, a city council must accomplish two tasks: (1) it must keep a copy of a proposed ordinance "on file at the office of the city clerk and at such other public place as the city council may designate;" and (2) "[n]otice of proposal . . . of . . . an ordinance shall be made by publishing the title and brief description of the . . . ordinance in such newspaper or newspapers as the city council shall direct."  RSA 47:18.  Although RSA 47:18 states "[t]he sufficiency of the published notice shall not affect the validity of the ordinance," the statute, nevertheless, requires the proposed ordinance be published.  *See id.*

45.     In Keene, "all Ordinances passed by the City Council shall take effect upon their passage unless otherwise directed by the City Council.  All Ordinances shall be signed by the Mayor and shall be recorded at length uniformly and permanently by the City Clerk, and each Ordinance so recorded shall be authenticated by the signature of the City Clerk."  Charter § 23.

**D.      The Novel Coronavirus**

46.     In late 2019 or early 2020, a novel viral infection known as the Novel Coronavirus (COVID-19) began circulating in the United States, first on the west coast and then on the east coast.  Dozens of residents in two nursing homes in Washington state became ill and died; they were confirmed to have been infected with COVID-19, the aforementioned novel virus that originated in Hubei province, China.  Other cases soon began to appear throughout the country.

47.     The various models earlier this year suggested this virus would wreck disaster on the United States, spreading rapidly and causing millions of deaths.  On March 16, 2020, a 20-page report from Neil Ferguson's team at Imperial College London "warned that an uncontrolled spread of the disease could cause as many as 510,000 deaths in Britain" and "up to 2.2 million

deaths in the United States."[5]  This report "triggered a sudden shift in the government's comparatively relaxed response to the virus" and "influenced the White House to strengthen its measures to isolate members of the public."[6]

**E.     The State of New Hampshire's Response to the Coronavirus**

48.     In the wake of the terrorist attacks on September 11, 2001, the New Hampshire General Court enacted legislation giving the Governor broad authority to take certain action during a "state of emergency."  This authority was codified in RSA 4:45, 4:47, 21-P:35, 21-P:37, and 21-P:43.

49.     RSA 4:45 defines what constitutes a "state of emergency," and RSA 4:47 defines and explains the "emergency management powers" the Governor may access after declaring a "state of emergency" under RSA 4:45.

50.     RSA 4:45, I states, "[t]he governor shall have the power to declare a state of emergency . . . by executive order if the governor finds that a natural, technological, or man-made disaster of major proportions is imminent or has occurred within this state, and that the safety and welfare of the inhabitants of this state require an invocation of the provisions of this section."

51.     A "state of emergency" is defined as a "condition, situation, or set of circumstances deemed to be so extremely hazardous or dangerous to life or property that it is necessary and essential to invoke, require, or utilize extraordinary measures, actions, and procedures to lessen or mitigate possible harm."  RSA 21-P:35, VIII.

52.     "A state of emergency shall terminate automatically 21 days after its declaration unless it is renewed under the same procedures set forth in paragraph I of this section."  RSA

---

[5] https://www.nytimes.com/2020/03/17/world/europe/coronavirus-imperial-college-johnson.html
[6] *Id.*

4:45, II.  "The governor may, by executive order, renew a declaration of a state of emergency as many times as the governor finds is necessary to protect the safety and welfare of the inhabitants of this state."  *Id.*

53.     "The legislature may terminate a state of emergency by concurrent resolution adopted by a majority vote of each chamber.  The governor's power to renew a declaration of a state of emergency shall terminate upon the adoption of a concurrent resolution . . . ; provided, however, that such resolution shall not preclude the governor from declaring a new emergency for different circumstances . . . ."  RSA 4:45, II(c).

54.     If the legislature takes no action, however, only the Governor can terminate a "state of emergency" declaration: "If the governor finds that maintaining the state of emergency is no longer justified, the governor shall issue an executive order terminating the state of emergency."  RSA 4:45, II(b).

55.     "During the existence of a state of emergency, and only for so long as such state of emergency shall exist, the governor shall have and may exercise the following additional emergency powers: . . . To perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population."  RSA 4:45, III(e).

56.     In addition, "[t]he governor shall have emergency management authority as defined in RSA 21-P:35, V, and pursuant to such authority may exercise emergency management powers including: . . . The power to make, amend, suspend and rescind necessary orders, rules and regulations to carry out the provisions of this subdivision in the event of a disaster beyond local control."  RSA 4:47, III.  "Emergency management" is defined as "the preparation for and the carrying out of all emergency functions, including but not limited to emergency response and

17

training functions, to prevent, minimize, and repair injury or damage resulting from the

occurrence or threat of widespread or severe damage, injury, or loss of life or property resulting

from any natural or human cause, including but not limited to fire, flood, earthquake, windstorm,

wave actions, technological incidents, oil or chemical spill, or water contamination requiring

emergency action to avert danger or damage, epidemic, air contamination, blight, drought,

infestation, explosion, terrorist act, or riot." RSA 21-P:35, V.

57.　　Pursuant to the powers above, Governor Sununu issued a series of executive

orders and emergency orders beginning in March and through the date of this filing to address

the outbreak of the Novel Coronavirus (COVID-19).

58.　　On March 13, 2020, Governor Sununu issued Executive Order 2020-04 ("An

order declaring a state of emergency due to Novel Coronavirus (COVID-19)"), which declared a

state of emergency for the entire state of New Hampshire. N.H. Exec. Order No. 2020-04 (Mar.

13, 2020).[7] That Order stated, "Pursuant to RSA 4:45 and RSA 4:47, while this Order is in

effect, additional temporary orders, directive, rules and regulations may be issued either by the

Governor or by designated State officials with written approval of the Governor." *Id.* ¶ 18.

59.　　Two days later, on March 15, 2020, Governor Sununu began issuing a series of

"Emergency Orders" addressing numerous aspects of society, ranging from school districts to the

conduct of businesses.

60.　　For example, on March 15, Governor Sununu issued Emergency Order #1

Pursuant to Executive Order 2020-04. N.H. Emer. Order No. 1 (Mar. 15, 2020).[8] That Order

stated "[a]ll public K-12 school districts within the state of New Hampshire shall transition to

---

[7] https://www.governor.nh.gov/news-media/orders-2020/documents/2020-04.pdf
[8] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-1.pdf

temporary remote instruction and support for a three week period beginning Monday, March

16th, 2020 and ending Friday, April 3rd, 2020." *Id.* ¶ 1.

61.     The next day, March 16, 2020, Governor Sununu issued Emergency Order #2

Pursuant to Executive Order 2020-04.  N.H. Emer. Order No. 2 (Mar. 16, 2020).[9]  That Order

prohibited "[s]cheduled gatherings of 50 people or more for social, spiritual and recreational

activities, including but not limited to, community, civic, public, leisure, faith based, or sporting

events; parades; concerts; festivals; conventions; fundraisers; and similar activities."  *Id.* ¶ 1.

62.     On March 18, 2020, Governor Sununu issued Emergency Order #6 Pursuant to

Executive Order 2020-04.  N.H. Emer. Order No. 6 (Mar. 18, 2020).[10]  That Order allowed

restaurants, diners, bars, and private clubs to "allow for takeout or delivery of beer and wine."

*Id.* ¶ 1.

63.     On March 21, 2020, Governor Sununu issued Emergency Order #10 Pursuant to

Executive Order 2020-04.  N.H. Emer. Order No. 10 (Mar. 21, 2020).[11]  That Order directed all

grocery stores, "[i]n order to prevent the spread of COVID-19 through grocery sales, and to

promote and secure the safety and protection of the people of New Hampshire," to "transition to

exclusive use of store provided single use plastic or paper bags when bagging groceries or other

products for customers."  *Id.* ¶ 1.

64.     On March 23, 2020, Governor Sununu issued Emergency Order #13 Pursuant to

Executive Order 2020-04.  N.H. Emer. Order No. 13 (Mar. 23, 2020).[12]  That Order directed all

pharmacies, "[t]o promote and secure the safety and protection of the people of New

Hampshire," to "compound and sell hand sanitizer over the counter," subject to certain

---

[9] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-2.pdf
[10] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-6.pdf
[11] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-10.pdf
[12] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-13.pdf

requirements, and stated "[t]he general public may visit a participating pharmacy on a walk-in basis and purchase compounded OTC hand sanitizer." *Id.* ¶ 1.

65.     The same day, Governor Sununu issued Emergency Order #16 Pursuant to Executive Order 2020-04.  N.H. Emer. Order No. 16 (Mar. 23, 2020).[13]  That Order reduced the limit on public gatherings established in Emergency Order #2 from 50 people to 10 people.  *Id.* ¶ 1.

66.     On March 26, 2020, Governor Sununu issued Emergency Order #17 Pursuant to Executive Order 2020-04.  N.H. Emer. Order No. 17 (Mar. 26, 2020).[14]  That Order directed "[a]ll businesses and other organizations that do not provide Essential Services" to "close their physical workplaces and facilities to workers, customers, and the public and cease all in person operations as of 11:59 p.m. on March 27, 2020 and shall not re-open to workers, customers or the public or resume in person operations before 12:01 a.m. on May 4, 2020." *Id.* ¶ 2.  It also ordered all New Hampshire citizens to "stay at home" except for several exceptions:

    a) Leaving home to get fresh air or exercise, provided that social distancing protocols consistent with guidance from the Division of Public Health are observed;
    b) Leaving home for outdoor recreation provided that appropriate social distancing protocols are observed and provided that such recreation complies with any limitations contained within Executive Order 2020-04 and any Emergency Orders issued pursuant to Executive Order 2020-04;
    c) Leaving home to run essential errands such as going to the grocery store, pharmacy, laundromat, or fulfilling any other errands an individual determines to be essential for everyday needs;
    d) Leaving home to visit a spouse, parent, or child;
    e) Leaving home to provide care for another person;
    f) Leaving home to go to the gas station;
    g) Leaving home to order and pick up take-out food;
    h) Receiving deliveries from Amazon, UPS, Fedex, the U.S. Postal Service, or any other deliveries;
    i) Leaving home to receive essential medical care or essential medical services;

---

[13] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-16.pdf
[14] https://www.governor.nh.gov/news-media/emergency-orders/documents/emergency-order-17-1.pdf

    j)  Leaving home for purposes of an individual's employment if the individual is employed at a business or organization that provides Essential Services or a business or organization to whom this Order does not apply pursuant to Sections 5-7; and

    k)  Leaving home for purposes of employment in cases where an individual is working remotely for a business that does not provide Essential Services.

*Id.* ¶ 4.

67.    On March 27, 2020, Governor Sununu issued Emergency Order #19 Pursuant to Executive Order 2020-04.  N.H. Emer. Order No. 19 (Mar. 27, 2020).[15]  That Order extended the period of remote instruction for schools another month.  *Id.* ¶ 1.

68.    On April 3, 2020, Governor Sununu then issued Executive Order 2020-05 ("Extension of State of Emergency Declared in Executive Order 2020-04"), which "renew[ed] the Declaration of a State of Emergency due to Novel Coronavirus (COVID-19) and extend[ed] the State of Emergency declared in Executive Order 2020-04 for a period of 21 days," or through April 24, 2020.  N.H. Exec. Order No. 2020-05 (Apr. 3, 2020).[16]  That Order extended "[a]ll provisions of Executive Order 2020-04, and all Emergency Orders issued pursuant thereto . . . ."  *Id.* ¶ 1.

69.    The next day, Governor Sununu issued Emergency Order #26 Pursuant to Executive Order 2020-04 as Extended by Executive Order 2020-05.  N.H. Emer. Order No. 26 (Apr. 4, 2020).[17]  That Order extended Emergency Order #6 (permission for restaurants, diners, bars, and private clubs to allow for takeout or delivery of beer and wine) and Emergency Order #16 (limit on public gatherings to 10 people) until May 4, 2020.  *Id.* ¶ 1.

70.    On April 16, 2020, Governor Sununu issued Emergency Order #32 Pursuant to Executive Order 2020-04, as Extended by Executive Order 2020-05.  N.H. Emer. Order No. 32

---

[15] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-19.pdf
[16] https://www.governor.nh.gov/news-media/orders-2020/documents/2020-05.pdf
[17] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-26.pdf

(Apr. 16, 2020).[18]  That Order extended the period of remote instruction for the rest of the school year, effectively canceling the school year.  *Id.* ¶ 1.

71.     On April 24, 2020, Governor Sununu issued Executive Order 2020-08 ("Second Extension of State of Emergency Declared in Executive Order 2020-04"), which again "renew[ed] the Declaration of a State of Emergency due to Novel Coronavirus (COVID-19) and extend[ed] the State of Emergency declared in Executive Order 2020-04 for a period of 21 days," or until May 15, 2020.  N.H. Exec. Order 2020-08 (Apr. 24, 2020).[19]  That Order extended "[a]ll provisions of Executive Order 2020-04 as extended by Executive Order 2020-05, and all Emergency Orders issued pursuant thereto . . . ."  *Id.* ¶ 1.

72.     On May 1, 2020, Governor Sununu issued Emergency Order #40 Pursuant to Executive Order 2020-04 as extended by Executive Orders 2020-05 and 2020-08.  N.H. Emer. Order No. 40 (May 1, 2020).[20]  That Order "extend[ed] and modif[ied] Emergency Order #17 (Closure of non-essential businesses and requiring Granite Staters to stay at home)."  *Id.*  It again directed "[a]ll businesses and other organizations [except for several types of businesses] that do not provide Essential Services [to] continue to close their physical workplaces and facilities to workers, customers and the public and [to] continue to cease all in person operations until 12:01 a.m. on May 31, 2020."  *Id.* ¶ 2.  The Order allowed certain businesses, such as barber shops and hair salons, to re-open but subject to certain restrictions: "In order to begin the gradual re-opening of New Hampshire's economy in a safe manner that places an emphasis on the needs of public health, certain businesses and organizations may resume operations (or select portions of their operations) according to the schedule and guidelines attached to this Order."  *Id.* ¶ 5.

---

[18] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-32.pdf
[19] https://www.governor.nh.gov/news-media/orders-2020/documents/2020-08.pdf
[20] https://www.governor.nh.gov/news-media/emergency-orders/documents/emergency-order-40.pdf

73.     To achieve that end, Emergency Order #40 provided "universal guidelines" for all New Hampshire employers and employees.  *Id.*, Ex. B.[21]  Section 4 of those guidelines states, "[w]hile at work and in public, employees should wear a cloth face covering to help protect against the spread of the virus."  *Id.*, Ex. B § 4.  Section 2 reiterates that guideline: "All employees . . . should . . . wear a cloth face covering while at work and in potential close contact with others."  *Id.*, Ex. B § 2.  So does section 6: "Employers must reduce the risk to employees in the workplace by supporting the use of cloth face coverings in areas where social distancing is difficult to maintain."  *Id.*, Ex. B § 6.

74.     Emergency Order #40 then identified the businesses it would permit to re-open: it allowed the food services industry, campgrounds, state parks, retail stores, golf courses, dentists, barbers, hair salons, drive-in movie theaters, outdoor attractions, and equestrian facilities to resume operations, and elective procedures at hospitals to resume, in accordance with certain guidelines.  *Id.*, Ex. C,[22] D.[23]  In virtually all instances, these guidelines require employees of these businesses and establishments to wear masks or face coverings.  *See id.*  Some of these businesses are required to *ask* customers or clients to wear masks or face coverings, including campgrounds, parks, retail stores, hospitals, and dentists.  *See id.*  Customers entering restaurants must wear face masks or coverings when entering or exiting an establishment, but not while seated; and customers at hair salons must wear face masks or coverings.  *See id.*  Customers at equestrian facilities must be asked to wear masks when in a barn but not while riding.  *See id.*  *Id.*

---

[21] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/files/inline-documents/emergency-order-40-ex-b.pdf
[22] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-40-c.pdf
[23] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/files/inline-documents/emergency-order-40-ex-d.pdf

75.     Like Emergency Order #17, Emergency Order #40 also ordered all New

Hampshire citizens to "stay at home" except for several exceptions:

a) Leaving home to get fresh air or exercise, provided that social distancing protocols consistent with guidance from the Division of Public Health are observed;

b) Leaving home for outdoor recreation provided that appropriate social distancing protocols are observed and provided that such recreation complies with any limitations contained within Executive Order 2020-04, as extended by Executive Orders 2020-05 and 2020-08, and any Emergency Orders issued pursuant to Executive Order 2020-04;

c) Leaving home to run essential errands such as going to the grocery store, pharmacy, laundromat, or fulfilling any other errands an individual determines to be essential for everyday needs;

d) Leaving home to visit a spouse, parent, or child;

e) Leaving home to provide care for another person;

f) Leaving home to go to the gas station;

g) Leaving home to order and pick up take-out food;

h) Receiving deliveries from Amazon, UPS, Fedex, the U.S. Postal Service, or any other deliveries;

i) Leaving home to receive medical or dental care or medical services;

j) Leaving home for purposes of an individual's employment if the individual is employed at a business or organization that provides Essential Services, a business or organization that has been permitted to resume certain in person operations pursuant to paragraph 4 of this Order, or a business or organization to whom this Order does not apply pursuant to paragraphs 7-9 of this Order; and

k) Leaving home for purposes of employment in cases where an individual is working remotely for a business that does not provide Essential Services, has not otherwise been permitted to resume in person operation, or is not exempted from this Order pursuant to paragraphs 7-9; and

l) Leaving home to patronize or seek services from a business or organization that is providing Essential Services, a business or organization that has been permitted to resume certain in person operations pursuant to paragraph 4 of this Order, or a business or organization to whom this Order does not apply pursuant to paragraphs 7-9 of this Order.

*Id.* ¶ 6.  It also again extended Emergency Order #6 (permission for restaurants, diners, bars, and

private clubs to allow for takeout or delivery of beer and wine) and Emergency Order #16 (limit

on public gatherings to 10 people) until May 31, 2020.  *Id.* ¶ 1.

76.     On May 15, 2020, Governor Sununu issued Executive Order 2020-09 ("Third Extension of State of Emergency Declared in Executive Order 2020-04"), which again "renew[ed] the Declaration of a State of Emergency due to Novel Coronavirus (COVID-19) and extend[ed] the State of Emergency declared in Executive Order 2020-04 for a period of 21 days," or until June 5, 2020.  N.H. Exec. Order 2020-09 (May 15, 2020).[24]  That Order extended "[a]ll provisions of Executive Order 2020-04 as extended by Executive Orders 2020-05 and 2020-08, and all Emergency Orders issued pursuant thereto . . . ."  *Id.* ¶ 1.

77.     At a press conference on May 29, 2020, Governor Sununu explained that the "stay at home order" (referring to Emergency Order #40 and its shutdown of non-essential businesses, "guidelines" certain businesses must follow if they re-open, and "stay-at-home" guidelines for individuals) would be extended to June 15, 2020.  As promised, Governor Sununu announced the extension of that order on May 31, 2020, which included new guidelines for additional businesses that may re-open.[25]

78.     On the same day, Governor Sununu issued Emergency Order #49 Pursuant to Executive Order 2020-04 as extended by Executive Orders 2020-05, 2020-08, and 2020-09. N.H. Emer. Order No. 49 (May 29, 2020).[26]  That Order extended Emergency Order #40 and all of its Exhibits until June 15, 2020.  *Id.*

79.     Governor Sununu did not expressly suspend any law or rule in any of the above Emergency Orders.

80.     On June 4, 2020, Governor Sununu distinguished the "stay at home" restrictions in Emergency Order #49, indicating he may let those restrictions expire on June 15, 2020, and

---

[24] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-09.pdf
[25] https://www.wmur.com/article/stay-at-home-order-extended-to-june-15-reopening-guidance-given-for-houses-of-worship-day-camps/32715508
[26] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-49.pdf

replace them with an "advisory," and the "state of emergency" declaration, stating "the state of emergency [declaration] ***is likely to go on for some time, because there are so many orders . . . attached to that that provide flexibility needed for the indefinite future***."[27]

81.     True to his word, on June 5, 2020, Governor Sununu issued Executive Order 2020-10 ("Fourth Extension of State of Emergency Declared in Executive Order 2020-04"), which again "renew[ed] the Declaration of a State of Emergency due to Novel Coronavirus (COVID-19) and extend[ed] the State of Emergency declared in Executive Order 2020-04 for a period of 21 days," or until June 26, 2020.  N.H. Exec. Order 2020-10 (June 5, 2020).[28]  That Order extended "[a]ll provisions of Executive Order 2020-04 as extended by Executive Orders 2020-05, 2020-08, and 2020-09, and all Emergency Orders issued pursuant thereto . . . ."  *Id.* ¶ 1.

82.     On June 15, 2020, although Governor Sununu allowed Emergency Order #49 to expire, he issued Emergency Order #52 Pursuant to Executive Order 2020-04 as extended by Executive Orders 2020-05, 2020-08, 2020-09 and 2020-10.  N.H. Emer. Order No. 52 (June 15, 2020).[29]  That Order loosened some restrictions on businesses but otherwise maintained many others, including the requirement that employees wear face masks or coverings and various limits on public gatherings, and it replaced the "stay-at-home" restrictions above with the same restrictions but "advised" that they be followed, rather than make them mandatory.  *See id.*

83.     Since then, Governor Sununu has issued four more Executive Orders (2020-14, 2020-15, 2020-16, and 2020-17), which collectively extended the "state of emergency" declaration until September 18, 2020.  *See* N.H. Exec. Order 2020-14 (June 26, 2020);[30] N.H.

---

[27] https://www.wmur.com/article/part-3-gov-sununu-answers-questions-about-covid-19-response/32772608
[28] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-10.pdf
[29]https://www.governor.nh.gov/sites/g/files/ehbemt336/files/files/inline-documents/emergency-order-52.pdf
[30] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-14.pdf

Exec. Order 2020-15 (July 17, 2020);[31] N.H. Exec. Order 2020-16 (Aug. 7, 2020);[32] N.H. Exec. Order 2020-17 (Aug. 28, 2020).[33]

84.     On July 31, 2020, Governor Sununu issued Emergency Order #61 Pursuant to Executive Order 2020-04 as extended by Executive Orders, 2020-05, 2020-08, 2020-10, 2020-14, and 2020-15.  N.H. Emer. Order No. 61 (July 31, 2020).[34]  That Order extended Emergency Order #52 until September 1, 2020.  *Id.*

85.     On August 11, 2020, Governor Sununu issued Emergency Order #63 Pursuant to Executive Orders, 2020-05, 2020-08, 2020-09, 2020-10, 2020-14, 2020-15, and 2020-16.  N.H. Emer. Order No. 63 (Aug. 11, 2020).[35]  That Order required face coverings for anyone attending "[s]cheduled gatherings of 100 people or more for social, spiritual, and recreational activities, including, but not limited to, community, civic, public, private, leisure, faith based, political, or sporting events; parades, concerts; festivals, conventions; fundraisers; and similar activities, where individuals are gathered in the same place at the same time."  *Id.* ¶ 1.  This requirement does not apply to "[s]cheduled gatherings where attendees are seated and separated by at least 6 feet," state and local governments, and schools.  *Id.* ¶ 2.

86.     In total, as of the date of this filing, Governor Sununu has issued 68 Emergency Orders addressing a wide range of topics and areas to combat the Coronavirus.

**F.     The Purpose of the Shutdown and the Current State of the Coronavirus in New Hampshire**

---

[31] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/executive-order-2020-5.pdf
[32] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-16.pdf
[33] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-17.pdf
[34] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/2020-07/emergency-order-61.pdf
[35] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/emergency-order-63.pdf

87.     The purpose and rationale for Governor Sununu's orders shutting down the New Hampshire economy were to "slow the spread of COVID-19."[36]  Slowing the spread of the Coronavirus would avoid overwhelming New Hampshire's healthcare system and allowing COVID-19-infected Granite Staters to die, untreated and uncared for, at home or in some hospital hallway.  Indeed, a group of New Hampshire academics wrote to Governor Sununu on March 23, 2020, that "New Hampshire currently has just over 3,000 hospital beds," and "[b]ased on our projections and those prepared by Harvard, our hospital system will be overwhelmed within three weeks."[37]  Two New Hampshire mayors publicly demanded Governor Sununu issue a stay-at-home order because, "the sooner everyone stays home, avoids unnecessary travel and non-essential activities, the better chance we have to flatten the curve and save lives."[38]

88.     Thus, this strategy's purpose was not to *prevent* people from contracting the Coronavirus.  After all, there is no vaccine.  Rather, it was to delay their contracting it so New Hampshire's healthcare system would not receive a large influx of Coronavirus cases they were not equipped to address.

89.     After over a month of applying this strategy, Governor Sununu acknowledged on April 29, 2020, that it was wildly successful.  In a news conference that day, he noted New Hampshire has "flattened the curve."[39]  He cited the number of hospitalizations as "one of the definitive markers of how close you are to hitting capacity on your health care system," and then reported, "[t]oday's census [of the number of hospitalized Coronavirus patients] is about 100, and we have a little over 1000 beds of capacity."  He continued: "We have multiple times available [hospital bed] capacity.  You know, we could literally have 10 times – God forbid – 10

---

[36] https://www.wmur.com/article/live-at-3-sununu-gives-update-on-covid-19/31941704
[37] https://www.concordmonitor.com/Shelter-in-place-33500097
[38] https://manchesterinklink.com/craig-and-donchess-urge-sununu-for-stronger-measures-against-covid-19/
[39] https://www.insidesources.com/opinion-if-weve-flattened-the-curve-why-is-new-hampshire-still-closed/

times the number of hospitalizations, and we could still very easily be able to handle that capacity."

90.     Governor Sununu was correct.  The New Hampshire Department of Health and Human Services reported a total of 1,019 COVID-19 beds.  As of April 30, 2020, there were 112 current hospitalizations.  (All statistics were obtained from the New Hampshire Department of Health and Human Services website[40] and the New Hampshire Public Radio website.[41]  Three of those hospitalizations were new.  At the time, there were also 84 ICU beds for the seriously-ill Coronavirus patients, and New Hampshire was using fewer than 30.[42]

91.     New Hampshire never got close to breaking the curve.  Its curve remained flat, and the goal of the Governor's initial shutdown orders was successfully achieved.  There is no longer an "emergency" in New Hampshire, or even a threat of one.

92.     However, "[w]hat were initially billed as temporary measures necessary to 'flatten the curve' and protect hospital capacity have become open-ended and ongoing restrictions aimed at a very different end—stopping the spread of an infectious disease and preventing new cases from arising."  *Cnty. of Butler*, Civil Action No. 2:20-cv-677, at *17.

93.     Indeed, several days beforehand, Governor Sununu issued Executive Order 2020-08, extending the declaration of a "state of emergency," as well as all Emergency Orders, another 21 days, from April 24 to May 15.  *See* N.H. Exec. Order 2020-08 (Apr. 24, 2020).[43]  Further, a week before that, Governor Sununu issued Emergency Order #32, which canceled the school year and directed all school districts to continue with remote instruction.

---

[40] https://www.nh.gov/covid19/news/updates.htm
[41] https://www.nhpr.org/post/explore-data-tracking-covid-19-new-hampshire#stream/0
[42] https://covid19.healthdata.org/united-states-of-america/new-hampshire
[43] https://www.governor.nh.gov/news-media/orders-2020/documents/2020-08.pdf

94.     As of May 1, 2020, the number of current hospitalizations dropped from 112 to 103, despite eight new hospitalizations, and the current hospitalization rate had steadily dropped to 8% (from 10%-11% the week before).  Also, at the time, there were just 1,249 current cases of Coronavirus in New Hampshire (with 980 recovered), and just 81 total deaths.  Despite this downward trend, Governor Sununu issued Executive Order 2020-09 on May 15, 2020, extending the declaration of a "state of emergency," as well as all Emergency Orders, another 21 days, from May 15 to June 5.  *See* N.H. Exec. Order 2020-09 (May 15, 2020).

95.     As of September 17, 2020, there are just 272 current cases in New Hampshire and just 7 current hospitalizations.  That equates to a 2.57% current hospitalization rate.  As of September 16, there were only 33 new cases, while the seven-day average in new cases is hovering just above 30 (down from 80-100 four months ago).  There have been only five deaths reported in the last week, while the seven-day average in new deaths is hovering between 1 and 2.

96.     The City of Keene currently has approximately 1-4 current cases (against a population of over 23,000),[44] and has reported just 39 total cases since this "outbreak" began.[45]

97.     New Hampshire's hospitals are so ***<u>underwhelmed</u>*** that they ***<u>furloughed and laid off employees</u>***.  For example, on April 15, 2020, Solution Health, which owns and operates Elliot Hospital System and Southern New Hampshire Health, furloughed 650 employees and cut the pay or hours of another 750 employees, affecting nearly 20% of its workforce.[46]  The company was losing more than $24 million per month in revenue after canceling elective surgeries and services to prepare for an anticipated surge in Coronavirus patients that never arrived.  Indeed,

---

[44] https://dashboard.nh.gov/t/DHHS/views/COVID-19LrgMaps/MAPCurrentCasesLrg.pdf
[45] https://www.nh.gov/covid19/dashboard/cumulative-cases.htm
[46] https://www.unionleader.com/news/health/coronavirus/elliot-sister-hospitals-announce-furloughs-pay-cuts-for-20-of-workforce/article_d754b0e9-4581-5037-856a-a8ad86b51907.html

just two weeks ago, Elliot Hospital in Manchester reported it had zero COVID cases.[47]  On April 3, 2020, the ownership group that owns Lakes Region General Hospital and Franklin Regional Hospital announced it was furloughing more than 600 employees, also in part due to the cancellation of elective and non-urgent surgeries, procedures, and outpatient visits, which resulted in more than a 50% loss of revenue.[48]

98.    Apart from the fact New Hampshire's healthcare system is not even close to capacity, the mortality rate for Coronavirus is far lower than initially projected.  The mortality rate (number of total deaths divided by the total population) in New Hampshire is 0.032% and approximately 0.06% in the United States, far below the 0.1% mortality rate for the seasonal flu.

99.    The number of deaths attributed to COVID-19 across the country, however, appear to have been grossly exaggerated.  On August 26, 2020, the Centers for Disease Control and Prevention ("CDC") reported that only 6% of Coronavirus-related deaths in the United States have COVID-19 listed as the only cause of death.[49]  The other 94% of Coronavirus-related deaths had other underlying medical conditions (called "comorbidities") listed, such as influenza, hypertensive disease, diabetes, and cardiac arrest.

100.    COVID-19 appears to be highly selective in those among the population to whom it poses the most risk: as of September 14, 2020, 95.8% (or 418) of 436 Coronavirus-related deaths in New Hampshire occurred in individuals above the age of 60, and 63.5% (or 277) of those deaths occurred in individuals above the age of 80.  There are 18 deaths under the age of 60.  Indeed, approximately 80% of deaths attributed to COVID-19 in New Hampshire have been

---

[47] https://www.wmur.com/article/elliot-hospital-down-to-zero-covid-19-patients/33609843
[48] https://www.unionleader.com/news/health/coronavirus/lakes-region-hospitals-to-furlough-more-than-600-employees/article_d9d43187-b2c0-5250-b056-25e9f1474d03.html
[49] https://www.ajc.com/news/nation-world/cdc-94-of-coronavirus-related-deaths-have-underlying-medical-conditions/62BMRRSGJVGIPATNMOXFIL3G6E/

in nursing homes or long-term care facilities.[50]  These statistics are buttressed by data from the CDC: "as of May 13, those older than 85 are 314 times more likely to die of COVID-19 than those aged 25–34; those under 15, by contrast, are 43 times *less* likely to die of the disease than those aged 25–34."[51]  In contrast, ***the flu is 17 times more deadly than COVID-19 for people under the age of 25*** (even with pre-existing conditions).[52]

101.    Regarding children, as of September 14, there were only ***689 total known cases of the Coronavirus in persons under 20 years old and zero deaths***.  (The number of cases per 10-year age bracket above age 20 often totals double that amount, usually north of 1,000 total cases.)  As early as April 29, 2020, the UK Daily Mail reported that experts could not find a single child under the age of 10 who had transmitted the Coronavirus to an adult.[53]

102.    In late July, the Texas Department of Health released data showing COVID-19 is less lethal, regardless of age, than the flu just two seasons ago.[54]

103.    In May 2020, a letter signed by hundreds of doctors was sent to President Trump warning of adverse health consequences stemming from Coronavirus-related shutdowns.[55]

104.    Less restrictive measures have always been available to address the risk the Coronavirus poses to the elderly.  NH DHHS has always had the authority (without the need for executive action from the Governor, let alone shutting down schools or the entire New Hampshire economy) to address that segment of the population through its own procedures for combating communicable diseases.  Section (r) of He-P 301.05 (titled "Restriction and Control

---

[50] https://www.nhpr.org/post/coronavirus-update-state-reports-37-new-cases-new-testing-site-manchester#stream/0
[51] https://freopp.org/estimating-the-risk-of-death-from-covid-19-vs-influenza-or-pneumonia-by-age-630aea3ae5a9
[52] *See id.*
[53] https://www.dailymail.co.uk/news/article-8271703/Experts-single-child-10-passed-coronavirus-adult.html
[54] https://www.thegatewaypundit.com/2020/07/stunning-texas-coronavirus-numbers-show-covid-19-less-lethal-last-two-flu-seasons/?utm_source=Twitter&utm_medium=PostTopSharingButtons&utm_campaign=websitesharingbuttons
[55] https://www.scribd.com/document/462319362/A-Doctor-a-Day-Letter-Signed

Measures for Isolation and Quarantine for Specific Diseases") states, "***For any communicable disease that poses a threat to the public's health*** and not already described in He-P 301.05 [list of known communicable diseases], ***all cases, suspect cases, and close contacts of cases or suspect cases of a communicable disease*** who work in sensitive occupations, such as healthcare, food service, and child care, ***or who are otherwise located in a congregate setting***, ***shall be excluded or restricted from certain activities until they are no longer infectious*** in accordance with RSA 141-C:4 ***if necessary to protect the health and safety of the public from a communicable disease***, and  based on the best available guidance and recommendations from the Centers for Disease Control and Prevention or other established sources."  (Emphasis added.) Given these measures that NH DHHS has had at its disposal for a long time, the Governor's orders above and the Department's actions were never necessary.

105.    Children and healthy adults under 60 are not at risk with this virus.  COVID-19 presents a statistically insignificant threat to the health of children, young adults, and healthy adults of middle and even slightly advanced age.

106.    There is also growing evidence that shutting down society is ***increasing*** transmission of the Coronavirus.  For example, in early June 2020, the World Health Organization stated the asymptomatic spread of the Coronavirus was "very rare," which contradicts the preliminary evidence obtained from the earliest outbreaks indicating the virus could spread from person-to-person contact, even if a carrier was asymptomatic.[56]  Then, during the summer in New York – the worst epicenter for the Coronavirus in the United States – 66% of new Coronavirus hospitalizations consist of people who *stayed home*: they are either retired or

---

[56] https://www.cnbc.com/2020/06/08/asymptomatic-coronavirus-patients-arent-spreading-new-infections-who-says.html

unemployed and not commuting to work on a regular basis.[57]  Meanwhile, the neighboring countries of Sweden and Denmark (which have similar social structures, demographics, and health care systems) took wildly different approaches to combatting the spread of the Coronavirus: Denmark locked down its schools, borders, restaurants, cafes, and shops, while Sweden merely encouraged citizens to use common sense, work from home if possible, and not gather in crowds over 50, but kept schools, bars, gyms, and restaurants open.[58][59]  The resulting infection rate between the two countries was approximately the same; Sweden's infection rate had stabilized; and Sweden's mortality rate was lower than most major European countries (which shut down their economies).[60]

107.    There is no "state of emergency" in New Hampshire, nor is there any threat to our state's health care system, let alone to children or healthy adults.  The original need for shutting down the New Hampshire economy and undertaking such strict protective measures no longer exists, and there exists no basis for Governor Sununu's recent orders extending that "state of emergency" and the extension of numerous restrictions on New Hampshire society.  The virus is also nowhere near as deadly as initially projected.  The continuing shutdown is preventing the New Hampshire population from achieving "herd immunity," which would ultimately eradicate the virus much more quickly than "slowing the spread" by forcing the shutdown of businesses, closure of schools, and ordering people to stay home.  It is also destroying the state's economy.

---

[57] https://www.nydailynews.com/coronavirus/ny-coronavirus-cuomo-coronavirus-stats-20200506-eyqui4b5lfdn7g6cqswkf6otly-story.html
[58] https://www.telegraph.co.uk/news/2020/05/05/sweden-suppressed-infection-rates-without-lockdown/
[59] https://www.webmd.com/lung/news/20200501/sweden-sticks-with-controversial-covid19-approach
[60] https://www.telegraph.co.uk/news/2020/05/05/sweden-suppressed-infection-rates-without-lockdown/

**G.      Keene's Enactment of an Ordinance Requiring Face Masks or Coverings**

108.    Despite this wealth of information demonstrating there is no emergency or epidemic in New Hampshire, on August 6, 2020, the City of Keene passed an ordinance requiring individuals who enter any business, who are present in any outdoor area serviced by a business, or who enter or are present in the common areas of any commercial or any residential building with three or more units to wear face masks or coverings.

109.    In late May 2020, Keene City Councilor Randy Filiault initially proposed a mask ordinance.  He withdrew the proposal a few days later after learning a similar ordinance in Nashua was being challenged in court.

110.    On July 29, 2020, the Keene City Council's Planning, Licenses, and Development Committee met and voted unanimously to recommend a revised mask ordinance to the full City Council.

111.    On August 6, 2020, the City Council voted 12-2 to formally adopt the ordinance.

112.    This ordinance obviously requires the individual Plaintiffs (Mr. Freeman, Ms. Lindenfeld, and Ms. DiMezzo) to wear face masks or coverings in various situations and circumstances covered by it.  It also requires them, in operating their business interests, to wear masks and require their own employees and patrons to wear masks.  The businesses and organization they operate are covered under the ordinance and must abide by it.

113.    A business that violates the ordinance shall be given a verbal warning for a first offense, a written warning for a second offense, a fine of $100 for a third offence and a five of $250 for any fourth or subsequent offense.

114.    An ordinance requiring face masks in wide community settings, however, is not effective in preventing the spread of the Coronavirus.   As early as April 6, 2020, the World Health Organization ("WHO") published a report titled "Advice on the use of masks in the

context of COVID-19," which concluded "[t]here is limited evidence that wearing a medical mask by healthy individuals in the households or among contacts of a sick patient, or among attendees of mass gatherings may be beneficial as a preventive measure.[61]  It then concluded further that "***there is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including COVID-19***."[62] Rather, the use of masks in a wide community setting poses significant risks: "The use of medical masks in the community may create a false sense of security, with neglect of other essential measures, such as hand hygiene practices and physical distancing, and may lead to touching the face under the masks and under the eyes, result in unnecessary costs, and take masks away from those in health care who need them most, especially when masks are in short supply."[63]  The article concluded with this advice to "decision makers on the use of masks for healthy people in community settings": "the wide use of masks by healthy people in the community setting is not supported by current evidence and carries uncertainties and critical risks."[64]

115.    Indeed, despite the City of Nashua's enactment of a more restrictive ordinance requiring face masks or coverings in similar community settings, Nashua Mayor James Donchess and two other City employees recently tested positive for COVID-19.[65]  Mayor Donchess explained "an employee he had recently met with had a family member who tested positive."[66]

---

[61] https://www.who.int/publications-detail/advice-on-the-use-of-masks-in-the-community-during-home-care-and-in-healthcare-settings-in-the-context-of-the-novel-coronavirus-(2019-ncov)-outbreak
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] https://www.unionleader.com/news/health/coronavirus/nashuas-mayor-among-city-hall-employees-testing-positive-for-covid-19/article_aac4dbeb-cdb6-5f3a-8af1-26daa10dc331.html
[66] *Id.*

Assuming Mayor Donchess was abiding by the City's ordinance, he would have been wearing a face mask or covering during that interaction, and – according to the City's cited basis for the ordinance – that mask or covering would have prevented him from contracting the virus.  Sadly, his use of a mask or covering (assuming he wore one, because government officials should *also* follow the law) did not prevent him from contracting it.  Rather, Mayor Donchess opined that "somehow this virus slipped through at City Hall."[67]  If face masks or coverings were actually effective, however, it should not have "slipped" through anything, let alone the very government officials who pushed the City's ordinance onto its citizens.

116.    The WHO's recommendation above was buttressed by studies and opinions that demonstrate face masks or coverings are not helpful in community settings.  For example, Dr. Russell Blaylock, a retired neurosurgeon and author, explained, "As for the scientific support for the use of face mask, a recent careful examination of the literature, in which 17 of the best studies were analyzed, concluded that, 'None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection.'"  Russell Blaylock, M.D., "Blaylock: Face Masks Pose Serious Risks to the Healthy," *Technocracy News & Trends*, May 21, 2020.[68]  Dr. Blaylock explained further: "[N]o studies have been done to demonstrate that either a cloth mask or the N95 mask has any effect on transmission of the COVID-19 virus. Any recommendations, therefore, have to be based on studies of influenza virus transmission. And . . . there is no conclusive evidence of their efficiency in controlling flu virus transmission." *Id.*  Rather, wearing a mask poses risks: "Several studies have indeed found significant problems with wearing such a mask.  This can vary from headaches, to increased airway resistance, carbon dioxide accumulation, to hypoxia, all the way to serious life-threatening complications."  *Id.*

---

[67] *Id.*
[68] https://www.technocracy.news/blaylock-face-masks-pose-serious-risks-to-the-healthy/

"[A]nother study of surgical masks found significant reductions in blood oxygen as well. . . . The longer the duration of wearing the mask, the greater the fall in blood oxygen levels." *Id.* Dr. Blaylock explained the importance of a drop in oxygen levels: "[A] drop in oxygen levels (hypoxia) is associated with an impairment in immunity. This sets the stage for contracting any infection, including COVID-19 and making the consequences of that infection much graver. In essence, your mask may very well put you at an increased risk of infections and if so, having a much worse outcome." *Id.* If that wasn't bad enough: "There is another danger to wearing these masks on a daily basis, especially if worn for several hours. When a person is infected with a respiratory virus, they will expel some of the virus with each breath. If they are wearing a mask, especially an N95 mask or other tightly fitting mask, they will be constantly rebreathing the viruses, raising the concentration of the virus in the lungs and the nasal passages. We know that people who have the worst reactions to the coronavirus have the highest concentrations of the virus early on. And this leads to the deadly cytokine storm in a selected number." *Id.*

117. Indeed, on July 31, 2020, the CDC released guidelines to state health departments about patients infected with the Coronavirus.[69] In a footnote, the CDC acknowledged that, although masks (when work properly) "may help those who are infected from spreading the infection," "there is less information regarding whether masks offer any protection for a contact exposed to a symptomatic or asymptomatic patient."[70]

118. In addition, in a study conducted by the National Taiwan University Hospital, it was found that the use of N-95 masks in healthcare workers caused them to experience hypoxemia, the low level of oxygen in the blood, and hypercapnia, an elevation in the blood's

---

[69] https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html
[70] *Id.*

carbon dioxide levels.[71]  Another study reported findings of headaches in health professionals using the same protective face mask and breathing difficulties in pregnant women wearing N-95 masks.[72]

119.    Indeed, "ventilation, cardiopulmonary exercise capacity and comfort are reduced by surgical masks and highly impaired."[73]

120.    Another recent study by a group of researchers from Duke University concluded that face coverings made of synthetic fabric (such as popular "neck gaiters") do not restrict air and, thus, provide no protection against transmitting or contracting virus particles.[74]

121.    Finally, just last week, in response to the wildfires in California, the CDC posted an announcement on its Facebook page concerning the use of cloth face masks in areas most affected by smoke:

[image on next page]

---

[71] https://clinicaltrials.gov/ct2/show/NCT00173017
[72] https://europepmc.org/article/med/16441251
[73] https://link.springer.com/epdf/10.1007/s00392-020-01704-y?sharing_token=4AfWegbHOxk00hiHYtrplPe4RwlQNchNByi7wbcMAY4ZfoGR_ibmFHApWSw2JRb7yoFxeXbxgdwNA2TYmPtz8OVhsr-eLNmHTAFlu6bFbQl5DaVnEieqTZNVL58LC3cW5QirGJONSGqeFdIMNEhxS2AmFJPw2wAfRsgDXHh9EII%3D
[74] https://advances.sciencemag.org/content/early/2020/08/07/sciadv.abd3083



122.    The Plaintiffs above participated in the organization of a rally scheduled for

August 15, 2020, in Keene, NH, protesting the use of face masks or coverings.  That rally drew

more than 100 people, and most individuals there (including the Plaintiffs) did not wear face

masks or coverings.

### CLAIMS

### COUNT I
*(Declaratory Judgment)*
*(Plaintiffs v. All Defendants)*

123.    Plaintiffs repeat and incorporates by reference the allegations of the paragraphs

above as if fully stated herein.

124.    There is a genuine and bona fide dispute and an actual controversy and

disagreement between Plaintiffs and the City of Keene regarding whether O-2020-09-A was

properly enacted, whether it is preempted by the Governor's various Emergency Orders, and whether it violates Plaintiffs' Constitutional rights.

125.    First, the City lacked the authority to enact O-2020-09-A because the state legislature did not expressly grant it any authority to enact an ordinance requiring citizens to wear face masks or coverings. *Girard v. Town of Allenstown*, 121 N.H. 268, 270-71 (1981).

126.    Second, even if the City had the authority to enact O-2020-09-A, Governor Sununu's numerous Emergency Orders addressing the Coronavirus preempt it.  A city "cannot regulate a field that has been preempted by the State." *Town of Rye Bd. Of Selectmen v. Town of Rye Zoning Bd. of Adjustment*, 155 N.H. 622, 624 (2007); *Casico v. City of Manchester*, 142 N.H. 312, 315 (1997).  "The preemption doctrine flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, State law.  One way in which municipal legislation will be preempted is if it expressly contradicts State law.  State law expressly preempts local law when there is an actual conflict between State and local regulation. An actual conflict exists when a municipal ordinance or regulation permits that which a State statute prohibits, or vice versa." *Town of Rye*, 155 N.H. at 624.   "The enactment of a detailed and comprehensive State regulatory scheme governing a particular field often demonstrates the State's intent to preempt that field by placing exclusive control in the State's hands." *Casico*, 142 N.H. at 315.  "In such circumstances, municipal legislation dealing with that field 'runs counter' to the State statutory scheme." *Id.*

127.    After declaring a "state of emergency" (and renewing that declaration three times), Governor Sununu has issued, to date, 68 Emergency Orders addressing nearly every industry and facet of the state of New Hampshire, including, but not limited to, schools, the food services industry, businesses, public gatherings, recreational activities, the medical field, and

individuals' day-to-day behavior.  These Orders comprise a comprehensive regulatory scheme governing the state's response to the Coronavirus, and it demonstrates the state's intent to preempt this field by placing exclusive control in the state's hands.

128.   O-2020-09-A conflicts with the scheme established by the Governor's Emergency Orders in several respects:

a.   Emergency Order #61, which extended Emergency Order #52 (and its prior iteration in Emergency Orders #40 and #49), permits individuals to go to grocery stores, pharmacies, laundromats, gas stations, medical and dental service providers, and all other businesses to patronize them.  It requires certain businesses and attractions that are permitted to re-open, such as campgrounds, parks, restaurants, retail stores, hospitals, and dentists, merely to ***ask*** customers to wear face masks or coverings when entering those establishments, but it does not require them to do so. Emergency Order #10 directed grocery stores to transition to "single use plastic or paper bags" but not to require customers to wear face masks or coverings.  In contrast, section b of O-2020-09-A states "[m]embers of the public ***entering any business for any purpose, including any outdoor area where business of any sort is conducted, are required to wear a face covering*** completely covering their nose and mouth."  (Emphasis added.). Similarly, section c of O-2020-09-A states, "[r]esidents, visitors, and members of the public ***entering or present within a residential apartment complex containing three or more residential units are required to wear a face covering over their nose and mouth while in the interior common areas, including but not limited to foyers, stairwells and elevators ("Common Areas") unless social distancing of six (6) feet can be maintained.  This requirement shall also apply to any business having such Common Areas, notwithstanding the number of business units within the business complex.***"  (Emphasis added.)

b.   Emergency Order #61 advises that individuals stay home but did not require them to wear a mask or face covering while anywhere within their place of residence, whether their own private residence or a common area. (Neither did Emergency Orders #40 or #49.)  Emergency Order #61 also permits individuals to leave their home in certain instances, including for "essential errands," "to visit close relatives," or "to provide care for another person."   N.H. Emer. Order No. 52, ¶ 3 (June 15, 2020).  In contrast, section c of O-2020-09-A, as noted above, states, "[r]esidents, visitors, and members of the public ***entering or present within a residential apartment complex containing three or more residential units are required to wear a face covering over their nose and mouth while in the . . . Common Areas.***"  (Emphasis added.).

129.    Third, O-2020-09-A violates violates Plaintiffs' Constitutional rights, as described in further detail below.

130.    There is also a genuine and bona Governor Sununu regarding whether Emergency Order #63 violates Plaintiffs' Constitutional rights, as described in further detail below..

131.    Plaintiffs request, in good faith, that this Court declare the following:

    a.    O-2020-09-A is null and void because the City lacked the authority to enact O-2020-09-A because the state legislature did not expressly grant it any authority to enact an ordinance requiring citizens to wear face masks or coverings; Governor Sununu's numerous Emergency Orders addressing the Coronavirus preempt it; and it violates Plaintiffs' Constitutional rights.

    b.    Emergency Order #63 is null and void because it violates Plaintiffs' Constitutional rights.

    c.    Any further ordinances enacted or Emergency Orders issued in response to the Coronavirus enacted/issued after the date of any order in this proceeding are void ab initio because the City lacks the authority to enact such ordinances because the state legislature did not expressly grant it any authority to do so, Governor Sununu's numerous Emergency Orders addressing the Coronavirus would preempt any such ordinances, and such measures violate Plaintiffs' Constitutional rights.

## COUNT II
### *(Violation of Free Exercise of Religion)*
### *(42 USC § 1983)*
### *(U.S. Const. amend. I)*
### *(Part 1, Art. 5, N.H. Const.)*
### *(Plaintiffs v. All Defendants)*

132.     Plaintiffs repeat and incorporate by reference the allegations of the paragraphs
above as if fully stated herein.

133.     The First Amendment to the United States Constitution states, "Congress shall
make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  The
Fourteenth Amendment to the U.S. Constitution imposes this prohibition on every state and local
government.  U.S. Const. amend. XIV.

134.     Part 1, Article 5 of the New Hampshire Constitution states, "Every individual has
a natural and unalienable right to worship God according to the dictates of his own conscience,
and reason; and no subject shall be hurt, molested, or restrained, in his person, liberty, or estate,
for worshipping God in the manner and season most agreeable to the dictates of his own
conscience; or for his religious profession, sentiments, or persuasion; provided he doth not
disturb the public peace or disturb others in their religious worship."

135.     O-2020-09-A and Emergency Order #63 violate Plaintiffs' right to freely exercise
their religious beliefs because it restricts them from engaging in church services, including those
involving gatherings of more than 100 people, without wearing face masks or coverings, where
such stringent restrictions do not exist on other secular businesses, such as airports, buses, trains,
medical facilities, libraries, shopping malls, office environments, restaurants, factories, grocery
stores, pharmacies, etc.

136.     In *Berean Baptist Church v. Governor Roy A. Cooper, III*, No. 4:20-CV-81-D
(E.D.N.C. May 16, 2020), a federal district court in North Carolina enjoined Governor Roy A.

44

Cooper, III's Executive Order 138, which imposed a limit on gatherings of 10 people on church services unless it was "impossible" to hold such service outdoors or through other accommodations, violated the Free Exercise Clause of the First Amendment.  *Id.* at *1-*2.   The district court granted the plaintiffs' emergency motion for a temporary restraining order, finding they met all four elements for such relief, and enjoined the Governor's enforcement of Executive Order 138.  *Id.* at *21-*22.  The court held Executive Order 138, on its face and even despite its "unless impossible" exception, restricted churches from holding gatherings of more than 10 people while permitting other secular businesses and establishments from holding larger gatherings.  *Id.* at *12-*15.  "A law is not neutral and generally applicable unless there is neutrality between religion and non-religion."  *Id.* at *16 (quoting *Roberts v. Neace*, No. 20-5465, 2020 WL 2316679, at *7 (6th Cir. May 9, 2020)).  "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones."  *Id.*

137.    Accordingly, the court applied strict scrutiny in evaluating whether Executive Order 138 violated the Free Exercise Clause.  *Id.* at *15-*17.  The court acknowledged "the Governor's compelling interest in seeking to prevent the spread of COVID-19" but then address "the question . . . whether the assembly for religious worship provisions in EO 138 amount to the 'least restrictive means' of serving that compelling interest."  *Id.* at *17.  The court concluded, however, that Executive Order 138 did not "afford [the plaintiffs] the same treatment as they and their fellow non-religious citizens receive when they work at a plant, clean an office, ride a bus, shop at a store, or mourn someone they love at a funeral."  *Id.*  The court noted further: "the Governor appears to trust citizens to perform non-religious activities indoors (such as shopping or working or selling merchandise) but does not trust them to do the same when they worship indoors together," and "[t]he Governor has failed to cite any peer-reviewed study showing that

religious interactions in those 15 states have accelerated the spread of COVID-19 in any manner distinguishable from non-religious interactions." *Id.* The court acknowledged that "an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all" "is not absolute" and "might be exercised . . . in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id.* at \*18 (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 28 (1905)). The district court held "[t]he assembly for religious worship provisions in EO 138 are not narrowly tailored to accomplish the compelling interest in protecting public health" and ultimately held the order violates the Free Exercise Clause of the First Amendment. *Id.*

138.    Similarly, in mid-April, the United States District Court for the Eastern District of Kansas granted a motion for a temporary restraining order ("TRO") enjoining Kansas Governor Laura Kelly's executive order (EO 20-18), which, unlike previous orders, specifically addressed "churches or other religious facilities" for the first time and imposed on them a prohibition on "mass gatherings" of more than 10 people. *First Baptist Church v. Kelly*, No. 20-1102-JWB, at \*2-\*3 (D. Kan. Apr. 18, 2020). EO 20-18 exempted many activities and facilities from that prohibition, like "governmental operations . . . airports; childcare locations; hotels; food pantries and shelters; detoxification centers; shopping malls 'and other retails establishments where large numbers of people are present but are generally not within arm's length of one another for more than 10 minutes'; libraries; restaurants, bars, and retail food establishments (including grocery stores), provided social distancing of 6 feet was maintained; office spaces; 'manufacturing, processing, distribution, and production facilities'; public transportation; and job centers." *Id.* at \*3-\*4. The Governor later issued another executive order (EO 20-25), which did not alter the

restrictions on churches but placed additional restrictions on three of the aforementioned businesses: retail establishments needed to be limited to employees and customers "performing essential activities or essential functions"; restaurants and bars were limited to no more than ten customers; and office spaces were limited to those 'performing essential activities or functions." *Id.* at *4.

139.    The district court in *First Baptist* held the plaintiffs met all the elements for a TRO, including likelihood of success on the merits.  *Id.* at *7-*9.  As in *Berean Baptist Church*, the district court in *First Baptist* applied strict scrutiny because Governor Kelly's executive orders "expressly restrict religious activity" and "were specifically targeted for more onerous restrictions than comparable secular activities" because ""due to the nature of the activity involved, rather than because such gatherings pose unique health risks that mass gatherings at commercial and other facilities do not, or because the risks at religious gatherings uniquely cannot be adequately mitigated with safety protocols."  *Id.* at *8-*15.  Thus, the district court held the restrictions in the Governor's orders could "be sustained only if it is narrowly tailored to further the compelling state interest in slowing or halting the spread of COVID-19."  *Id.* at *15.

140.    Under this standard, the district court held "Plaintiffs are likely to prevail on their assertion that the restriction on religious mass gatherings is not narrowly tailored" because "Plaintiffs can likely show that the broad prohibition against in-person religious services of more than ten congregants is not narrowly tailored to achieve the stated public health goals where the comparable secular gatherings are subjected to much less restrictive conditions."  *Id.* at *15-*16.[75]

---

[75] The district court issued the TRO but under certain parameters suggested by the Plaintiffs that incorporated various social distancing measures and declined to issue an order allowing Plaintiffs to conduct their religious

141.    Then, the United States District Court for the Western District of Kentucky issued a TRO enjoining a prohibition on drive-in church services.  *On Fire Christian Ctr. v Fischer*, No. 3:20-CV-264-JRW, at *1-*2 (W.D. Ky. Apr. 11, 2020).  The Mayor of Louisville, Kentucky, banned religious services, including drive-up services, in light of the "public health emergency caused by the exponential spread of COVID-19," but allowed drive-through restaurants and liquor stores to remain open.  *Id.* at *7.  The district court held the Mayor's ban failed strict scrutiny because it was not narrowly tailored to advance his interest to contain the COVID-19 pandemic.  *Id.* at *12.  Indeed, the ban was "underinclusive" and "overboard": "underinclusive because [it doesn't] prohibit a host of equally dangerous (or equally harmless) activities that Louisville has permitted on the basis that they are 'essential.'  Those 'essential' activities include driving through a liquor store" pick-up window, parking in a liquor store's parking lot, or walking into a liquor store where other customers are shopping."  *Id.* at *12-*13.  It was "overbroad because, at least in this early stage of the litigation, it appears likely that Louisville's interest in preventing churchgoers from spreading COVID-19 would be achieved by allowing churchgoers to congregate in their cars as On Fire proposes."  *Id.* at *13.

142.    Like the executive orders above in, O-2020-09-A and Emergency Order #63 directly target churches and places of worship because they require the use of face masks or coverings in places of worship.  Accordingly, this Court would be required to apply strict scrutiny to these measures and determine whether they further a "compelling government interest" and are narrowly tailored to achieve that interest.  These measures satisfy neither element.

---

activities using the same measures specified in executive orders for similar exempt activities without further evidence.  *Id.* at *17.

143.    First, as described above, assuming the City and the Governor's compelling government interests are the protection of the public health from COVID-19, there is no such emergency or danger to the public health in New Hampshire at this time.

144.    Second, even if that interest in protecting the public health was compelling, O-2020-09-A and Emergency Order #63 are not narrowly tailored to achieve that interest.

145.    These measures require individuals to wear face masks or coverings when engaging these spiritual services.  As in *Berean*, they do not afford Plaintiffs the same treatment they and their fellow non-religious citizens receive when they work at or patronize a business, ride a bus, or shop at a store.  They do not place similar restrictions on these businesses, establishments, or services.  Although they require individuals adhere to social distancing guidelines when visiting or patronizing these other establishments, they trust people to engage in these activities and adhere to these guidelines without such restrictions but do not trust them to do the same when engaging in church services.  Also, as in *Berean*, the Defendants have failed to cite any peer-reviewed study in either of these measures – indeed there is no such information anywhere – showing that religious interactions in the many states where there are no such face mask or covering requirements on church services have accelerated the spread of COVID-19 in any manner distinguishable from non-religious interactions.  Thus, O-2020-09-A and Emergency Order #63 are not narrowly tailored to accomplish the compelling interest in protecting public health and violate Plaintiffs' right of free exercise of their religious beliefs under the U.S. and New Hampshire Constitutions.

**COUNT III**
***(Violation of Freedom of Speech)***
***(42 USC § 1983)***
***(U.S. Const. amend. I)***
***(Part 1, Art. 22, N.H. Const.)***
***(Plaintiffs v. All Defendants)***

146.    Plaintiffs repeat and incorporate by reference the allegations of the paragraphs above as if fully stated herein.

147.    The First Amendment of the United States Constitution states, "Congress shall make no law . . . abridging the freedom of speech."  The Fourteenth Amendment applied this restriction to state governments: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

148.    Part 1, Article 22 of the New Hampshire Constitution states, "Free speech and Liberty of the press are essential to the security of Freedom in a State: They ought, therefore, to be inviolably preserved."

149.    O-2020-09-A and Emergency Order #63 are unconstitutional abridgements of Plaintiffs' right to freedom of speech under First and Fourteenth Amendments of the United States Constitution and the New Hampshire Constitution.

150.    They are overbroad because they attempt to control conduct by means that invade Plaintiffs' area of protected freedom.

151.    By requiring Plaintiffs cover their mouths in public or in certain gatherings, they forbid them and other citizens from expressing themselves in a clear way, or from using facial expressions and other facial mannerisms to express themselves.  Further, they prevent Plaintiffs and other citizens from expressing their disagreement with the measures themselves because they expressly prevent them from one type of expression that communicates that disagreement: *not* wearing a face mask or covering.

50

152.    O-2020-09-A and Emergency Order #63 do not serve a significant government objective: although their stated purposes are to minimize the threat to public health, New Hampshire's own COVID-19 date unequivocally demonstrates there is no such threat to the public health.

153.    Even if there is such an objective, these measures are neither narrowly tailored nor the least restrictive means available to achieve it: both measures require everyone (regardless whether one is infected or not, or whether one has contracted the virus and recovered) to wear a face mask or covering; O-2020-09-A requires wearing a face mask or covering even where social distancing can be achieved; and O-2020-09-A requires wearing a face mask or covering within the common areas of residential buildings even when in contact with family members or members of one's own household.

154.    Accordingly, O-2020-09-A and Emergency Order #63 violate Plaintiffs' right to free speech under the First and Fourteenth Amendments of the United States Constitution and the New Hampshire Constitution.

155.    As a result of Defendants' actions, Plaintiffs have suffered damages.

**COUNT IV**
*(Violation of Procedural Due Process)*
*(42 USC § 1983)*
*(Plaintiffs v. All Defendants)*

156.    Plaintiffs repeat and incorporate by reference the allegations of the paragraphs above as if fully stated herein.

157.    The Fourteenth Amendment to the United States Constitution states, "No state . . . shall . . . deprive any person of life, liberty, or property, without due process of law."  This Amendment protects Plaintiffs and other citizens from the arbitrary and unreasonable exercise of governmental power.

158.     O-2020-09-A and Emergency Order #63 deprive Plaintiffs and other citizens of

their privileges and liberty because they prevent them from choosing whether or not to wear a

face mask or covering.

159.     Accordingly, they violate their right to procedural due process under the

Fourteenth Amendment to the United States Constitution.

160.     As a result of Defendants' actions, Plaintiffs have suffered damages.

**COUNT V**
*(Violation of Right of Assembly)*
*(42 USC § 1983)*
*(U.S. Const. amend. I)*
*(Part 1, Art. 32, N.H. Const.)*
*(Plaintiffs v. All Defendants)*

161.     Plaintiffs repeat and incorporate by reference the allegations of the paragraphs

above as if fully stated herein.

162.     The First Amendment of the United States Constitution states, "Congress shall

make no law . . . abridging . . . the right of the people peaceably to assembly."  The Fourteenth

Amendment applied this restriction to state governments: "No state shall make or enforce any

law which shall abridge the privileges or immunities of citizens of the United States."

163.     Part 1, Article 32 of the New Hampshire Constitution states, "The People have a

right, in an orderly and peaceable manner, to assemble and consult upon the common good."

164.     O-2020-09-A and Emergency Order #63 are overbroad because they restrict

Plaintiffs from exercising their right of assembly.  By requiring them and other citizens to cover

their mouths in public or in certain gatherings, they forbid them and other citizens from

assembling and expressing their grievances in a clear way, or from using facial expressions and

other facial mannerisms to do so.  Further, they prevent them and other citizens from assembling

to express their disagreement with the measures themselves because they expressly prevent them

from one type of expression that communicates that disagreement: *not* wearing a face mask or covering.

165.    Accordingly, O-2020-09-A and Emergency Order #63 violate Plaintiffs' right of assembly under the First and Fourteenth Amendments of the United States Constitution and the New Hampshire Constitution.

166.    As a result of Defendants' actions, Plaintiffs have suffered damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare O-2020-09-A null and void because the City lacked the authority to enact O-2020-09-A because the state legislature did not expressly grant it any authority to enact an ordinance requiring citizens to wear face masks or coverings; and Governor Sununu's numerous Emergency Orders addressing the Coronavirus preempt it;

B.    Declare O-2020-09-A and Emergency Order #63 null and void because they violate Plaintiffs' constitutional rights;

C.    Preliminarily and permanently enjoin the enforcement of O-2020-09-A and Emergency Order #63;

D.    Preliminarily and permanently enjoin any further similar ordinances enacted by the City of Keene or similar emergency orders issued by the Governor in response to the Coronavirus issued after the date of any order issued in this proceeding;

E.    Enter judgment in favor of Plaintiffs on all counts;

F.    Award Plaintiffs their damages;

G.    Award Plaintiffs their attorney's fees and costs; and

H.    Award such other relief as is just and equitable.

## REQUEST FOR JURY TRIAL

Plaintiffs request a trial by jury on all claims so triable.

Respectfully submitted,

IAN B. FREEMAN, SHIRE FREE
CHURCH MONADNOCK, MALAISE
LINDENFELD, PHO KEENE GREAT
LLC, ARIA DIMEZZO, ARIA DIMEZZO
(d/b/a REFORMED SATANIC CHURCH),

By Their Attorneys,

FOJO LAW, P.L.L.C.

Dated:  September 18, 2020

*/s/Robert M. Fojo*
Robert M. Fojo, Esq. (#19792)
264 South River Road, Suite 464
Bedford, NH 03110
(603) 473-4694
rfojo@FojoLaw.com

## **VERIFICATION**

I, Ian B. Freeman, both individually and on behalf of Shire Free Church Monadnock,

certify that the foregoing facts are true and correct to the best of my knowledge and belief.

_____
Ian B. Freeman

STATE OF   Florida

COUNTY OF  Hillsborough

The foregoing instrument was acknowledged before me this  14th  day of September,

2020, by Ian B. Freeman. who personally appeared before me, Lee Smith, a notary public.

LEE SMITH
Notary Public - State of Florida
Commission # GG 912208
Expires on September 11, 2023

(Seal)

_____
Signature of Notary Public
Print, Type/Stamp Name of Notary

Notarized online using audio-video communication

Personally known: _____

OR Produced Identification: _____✔_____

Type of Identification Produced: Driver's License

## **VERIFICATION**

I, Malaise Lindenfeld, both individually and on behalf of Pho Keene Great, LLC, certify

that the foregoing facts are true and correct to the best of my knowledge and belief.

_____
Malaise Lindenfeld

STATE OF NEW HAMPSHIRE

COUNTY OF CheShire

The foregoing instrument was acknowledged before me this _15_ day of September,

2020, by Malaise Lindenfeld.

(Seal)

_____
Signature of Notary Public
Print, Type/Stamp Name of Notary

Personally known: ✓
OR Produced Identification: _____
Type of Identification Produced: _____

ANN M. CONNOR
Notary Public - New Hampshire
My Commission Expires March 25, 2025

## **VERIFICATION**

I, Aria DiMezzo, both individually and on behalf of Reformed Satanic Church, certify

that the foregoing facts are true and correct to the best of my knowledge and belief.

_____
Aria DiMezzo

STATE OF NEW HAMPSHIRE

COUNTY OF _Cheshire_

The foregoing instrument was acknowledged before me this _14_ day of September,

2020, by Aria DiMezzo.

(Seal)

_____
Signature of Notary Public
Print, Type/Stamp Name of Notary

Personally known: _____
OR Produced Identification: _X_____
Type of Identification Produced: _ms DL_
_and Legal Name_
_Change documents_

COLLEEN H. KOLASIENSKI, Notary Public
State of New Hampshire
My Commission Expires August 23, 2022