UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Ian B. Freeman et al.</u>

v.

<u>City of Keene et al.</u>

Civil No. 20-cv-963-LM
Opinion No. 2021 DNH 122 P

# O R D E R

Plaintiffs Ian B. Freeman, Shire Free Church Monadnock, Malaise Lindenfeld, Pho Keene Great, LLC, and Aria DiMezzo (d/b/a Reformed Satanic Church) bring this action for declaratory, injunctive, and monetary relief against defendants City of Keene and Governor Christopher T. Sununu.  Plaintiffs challenge the legality of a city ordinance and three of the Governor's emergency orders, all of which required persons to wear face masks in certain circumstances. Presently before the court are defendants' motions to dismiss.  <u>See</u> doc. nos. 15 and 16.  Defendants argue, <u>inter alia</u>, that plaintiffs lack standing because plaintiffs fail to allege that they have suffered or are likely to suffer any concrete, particularized injury.  For the reasons explained below, the court agrees that plaintiffs have not demonstrated standing and that this court lacks subject-matter jurisdiction. Defendants' motions to dismiss are therefore granted.

## STANDARD OF REVIEW

There are two ways to challenge a court's subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[1]  See Hernández-Santiago v. Ecolab, Inc., 397 F.3d 30, 33 (1st Cir. 2005); see also 5B Arthur R. Miller et al., Federal Practice & Procedure: Civil § 1350 (3d ed.).  First, the defendant may challenge the sufficiency of the allegations relied upon in the complaint to support jurisdiction.  See Hernández-Santiago, 397 F.3d at 33.  Alternatively, the defendant can challenge the accuracy of the complaint's jurisdictional allegations.  See id.  The court's standard of review differs depending on the challenge brought.  See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).  Where a defendant challenges only the sufficiency of the complaint's jurisdictional facts, the standard of review is the same as the Rule 12(b)(6) standard.  See Sevigny v. United States, Civ. No. 13-cv-401-PB, 2014 WL 3573566, at *2-3 (D.N.H. July 21, 2014); Valentin, 254 F.3d at 363.  Where a defendant challenges the accuracy of the plaintiffs' allegations, those allegations "are entitled to no presumptive weight," and "the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties."  Valentin, 254 F.3d at 363.

---

[1] Defendants purport to bring their standing challenges under Federal Rule of Civil Procedure 12(b)(6).  See doc. nos. 15-1 at 4-5; 16 at 1; 21 at 1-3.  However, standing is an issue of subject-matter jurisdiction.  See Drewniak v. U.S. Customs and Border Prot., Civ. No. 20-cv-852-LM, 2021 WL 1318028, at *1-2 (D.N.H. Apr. 8, 2021).  Since Rule 12(b)(1) governs challenges to the court's subject-matter jurisdiction, the court analyzes defendants' standing challenges under Rule 12(b)(1).

Here, defendants challenge only the sufficiency of the facts relied upon in the amended complaint to demonstrate jurisdiction.  Therefore, the court resolves the standing issue under the familiar Rule 12(b)(6) standard.  Under this standard, the court accepts the factual allegations in the complaint as true and construes reasonable inferences in plaintiffs' favor.  See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71, 75 (1st Cir. 2014).  The court may also consider facts susceptible to judicial notice, Rodríguez-Ramos v. Hernández-Gregorat, 685 F.3d 34, 37 (1st Cir. 2012), as well as any documents the authenticity of which is not disputed by the parties, official public records, documents central to plaintiffs' claims, or documents sufficiently referred to in the complaint, see Ironshore Specialty Ins. Co. v. United States, 871 F.3d 131, 135 (1st Cir. 2017).  Dismissal is required if "the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003).

In addition to their standing challenges, defendants argue that plaintiffs' amended complaint fails to state a claim under Rule 12(b)(6).  "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Ne. Erectors Ass'n of BTEA v. Sec'y of Labor, 62 F.3d 37, 39 (1st Cir. 1995) (citing Miller et al., supra ("[T]he cases are legion stating that the district court should consider the Rule 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot . . . .").  "It is not simply formalistic to decide the jurisdictional issue when the case

would be dismissed in any event for failure to state claim.  Different consequences

flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the

former, not being on the merits, is without res judicata effect."  Id. (citation

omitted).  Here, because the court concludes that plaintiffs lack standing, it does not

reach defendants' additional arguments for dismissal.  See id.; Deniz v. Munic. of

Guaynabo, 285 F.3d 142, 150 (1st Cir. 2002) (regarding district court's 12(b)(6)

ruling "as a nullity" because district court lacked subject-matter jurisdiction); see

also, e.g., Aung v. Prettenhoffer, ___ F. Supp. 3d ___, 2021 WL 2458204, at *7-8 (D.

Mass. June 16, 2021).


## BACKGROUND

The following facts are drawn from the amended complaint except where

otherwise indicated.


I.   The Governor's Emergency Orders

COVID-19 began circulating in the United States in late 2019 or early 2020.

Statistical models from that time suggested the virus would have a disastrous effect

on the country, spreading rapidly and causing millions of deaths.  For example, a

report issued by a team at Imperial College in London predicted that, if left

unchecked, COVID-19 could cause up to 2.2 million deaths in the United States.

Under New Hampshire law, the Governor has "the power to declare a state of

emergency . . . by executive order if the governor finds that a natural, technological,

or man-made disaster of major proportions is imminent or has occurred within this state," and that such a declaration is needed to protect "the safety and welfare of the inhabitants of this state."  RSA 4:45, I (2013) (amended 2021).  "During the existence of a state of emergency, and only for so long as such state of emergency shall exist, the governor shall have and may exercise . . . emergency powers," RSA 4:45, III (2013), including any power that is "necessary to promote and secure the safety and protection of the civilian population," RSA 4:45, III(e).  See also RSA 4:47, III (2013) (governor also possesses "[t]he power to make . . . necessary orders . . . to carry out the provisions of this subdivision in the event of a disaster beyond local control").

"A state of emergency shall terminate automatically 21 days after its declaration, unless it is renewed under the same procedures set forth in paragraph I of this [statute]."  RSA 4:45, II(a) (2013).  "The governor may, by executive order, renew a declaration of a state of emergency as many times as the governor finds is necessary to protect the safety and welfare of the inhabitants of this state."  Id. Prior to June 28, 2021, the New Hampshire Legislature could "terminate a state of emergency by concurrent resolution adopted by a majority vote of each chamber." RSA 4:45, II(c) (2013) (amended 2021); see 2021 N.H. Laws 91:459 (amending RSA 4:45, II(c) to state that the legislature may terminate a state of emergency or any emergency order issued pursuant to a state of emergency by a simple majority vote of both houses); 2021 N.H. Laws 91:462-a.

On March 13, 2020, the Governor issued an executive order declaring a state of emergency due to COVID-19.  <u>See</u> N.H. Exec. Ord. 2020-04 (Mar. 13, 2020).[2] After declaring a state of emergency, the Governor began issuing "emergency orders" pursuant to RSA 4:45, III, and RSA 4:47.  As is relevant to this case, the governor issued an emergency order on August 11, 2020,[3] "requiring face coverings for certain scheduled gatherings of 100 or more individuals."  N.H. Emer. Ord. 63 (Aug. 11, 2020).  Specifically, Emergency Order 63 required face coverings for persons attending

> [s]cheduled gatherings of 100 or more people for social, spiritual, and recreational activities, including, but not limited to, community, civic, public, private, leisure, faith based, political, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities; where individuals are gathered in the same place at the same time.

<u>Id.</u> ¶ 1.  The mask requirement did not apply to "[s]cheduled gatherings where attendees are seated and separated by at least 6 feet from any person except those that are (i) a member of that person's household, or (ii) part of that person's party, or (iii) assigned to that person's table."  <u>Id.</u> ¶ 2(a).  Nor did it apply to state and local governments, schools, or children under the age of two.  <u>Id.</u> ¶ 2(b)-(c).

---

[2] All of the Governor's executive and emergency orders relating to the COVID-19 pandemic are available at the following URL: <u>https://www.governor.nh.gov/news-and-media/covid-19-emergency-orders-2020</u>.

[3] Through a series of executive orders, the Governor continuously extended the COVID-19 state of emergency from March 13, 2020, through June 11, 2021.  <u>See</u> Exec. Ord. 2021-10 (May 28, 2021).

Emergency Order 63 specified that "[i]t shall constitute a violation of this Order if" an "entity, property owner, facility owner, or person that organizes or allows its property/facility to be used for a scheduled gathering of 100 or more people . . . (a) knowingly violates this Order, or (b) refuses to comply with a prior warning about the requirements set forth in this Order." Id. ¶ 4.  The Governor authorized the Division of Public Health and state and local police to enforce Emergency Order 63.  Id. ¶ 5; see also N.H. Emer. Ord. 65 (Aug. 13, 2020) (authorizing criminal and civil penalties for violation of any COVID-19 emergency order).

On November 19, 2020, the Governor issued Emergency Order 74 "requiring persons to wear masks or cloth face coverings when in public spaces without physical distancing."  N.H. Emer. Ord. 74 (Nov. 19, 2020).  Specifically, the order required

> all persons over the age of 5 within the State of New Hampshire [to] wear a mask or cloth face covering over their noses and mouths any time they are in public spaces, indoors or outdoors, where they are unable to or do not consistently maintain a physical distance of at least six feet from persons outside their own households.

Id. ¶ 1.  The order defined "public spaces" to include "any part of private or public property that is generally open or accessible to members of the general public," including but not limited to "lobbies, waiting areas, outside plazas or patios, restaurants, retail businesses, streets, sidewalks, parks, beaches, elevators, restrooms, stairways, [and] parking garages."  Id. ¶ 2.

The order specifically exempted nine categories of persons from its requirements, including students and staff within public schools, persons with medical conditions, and persons obtaining or providing services that require temporary removal of a face mask.  See id. ¶ 5.  The order did not preclude municipalities "from enacting their own ordinances related to the wearing of masks or cloth face coverings that contain stricter provisions than those contained within this Order."  Id. ¶ 4.

By its own terms, Emergency Order 74 was to remain in effect through January 15, 2021.  Id. ¶ 7.  On that date, the Governor issued Executive Order 81, which extended the provisions of Emergency Order 74 through March 26, 2021.  See N.H. Emer. Ord. 81 (Jan. 15, 2021).[4]

II.   The City's Ordinance

On August 6, 2020, the City enacted Ordinance O-2020-09-A, entitled "An Ordinance Relating to the Wearing of Face Coverings" ("the ordinance").  See doc. no. 16-2.  The ordinance required employees of "businesses" to wear a face covering when interacting with the public.  Id. § 66-171(a).  It also required members of the public "entering any business for any purpose" to wear face coverings "while conducting their business."  Id. § 66-171(b).  The ordinance defined "business" as

> any place, premises, or location within a premises ("Premises"),
> operated either for profit or not for profit, which is generally open to, or

---

[4] The Governor subsequently extended Emergency Order 74 through April 16, 2021.  See N.H. Emer. Ord. 87 (Mar. 26, 2021).  Plaintiffs have not sought to amend their complaint to challenge Emergency Order 87.

accessible to the public, and into which the public is invited for the
purpose of conducting any business customarily provided to the public
by the business, including but not limited to retail stores, restaurants,
banks, fitness centers, personal care facilities, food banks, grocery
stores, thrift stores, theaters, City of Keene public facilities, and public
conveyances licensed by the City of Keene; provided, however, that
"business" shall not include any home occupation or business located
ancillary to, or entirely within a private residence.

Id. § 66-171(d).  The ordinance also required persons to wear face coverings when

present within the "interior common areas" of any "residential apartment complex

containing three or more residential units" unless social distancing of six feet could

be maintained.  Id. § 66-171(c).

The penalty for a "member of the public" for noncompliance with the

ordinance was limited to denial of entry to the facility he or she wished to visit.  See

id. § 66-171(i).  The ordinance provided graduated penalties for any "business" that

violated the ordinance: "a verbal warning for a first offense; a written warning for a

second offense; a fine of $100 for any third offense; and a fine of $250 for any fourth

or subsequent offense."  Id.  The ordinance exempted children under the age of ten

and persons with medical or developmental conditions who could not safely wear a

mask or face covering.  Id. § 66-171(f)-(g).

Finally, the ordinance provided that it would "automatically and immediately

terminate, without the necessity of further action . . . upon the termination of the

COVID-19 State of Emergency by the Governor of the State of New Hampshire."  Id.

§ 66-171(*l*).

III.   <u>The Plaintiffs</u>

The amended complaint contains the following—and only the following—information regarding the plaintiffs.

Plaintiff Ian B. Freeman is a radio talk show host, a minister, and an "ambassador" at "Bitcoin Embassy, NH."  His talk show, "Free Talk Live," is broadcast from within the City.  It is syndicated on over 200 radio stations and two television stations across the country.

The amended complaint contains no factual allegations regarding plaintiff Shire Free Church Monadnock.

Plaintiff Malaise Lindenfeld is a chef and restaurateur.  She has operated three restaurants in New Hampshire: Audrey's Café, Piedra Fina, and Pho Keene Great.  Audrey's Café and Piedra Fina permanently ceased operations in early 2021.[5]  Pho Keene Great is still in operation.

Plaintiff Pho Keene Great, LLC, is a Vietnamese restaurant in Keene.  It primarily serves the Vietnamese soup "pho," which is a dish consisting of broth, rice noodles, herbs, and meat.

Plaintiff Aria DiMezzo is an author and was recently nominated by the Republican Party for the Cheshire County Sheriff.

Plaintiffs organized and participated in a rally within the City on August 15, 2020, protesting the use of face masks or coverings.  The rally drew more than 100

---

[5] Plaintiffs do not allege that the measures challenged in this lawsuit caused these restaurants to close.

people.  Plaintiffs, along with most other attendees, did not wear face masks or coverings at the rally.  Plaintiffs do not allege that they were deterred from organizing or participating in this rally due to the ordinance or any of the Governor's emergency orders.  Nor do they allege that they were threatened with enforcement of the ordinance or an emergency order at the rally, let alone that the ordinance or an order was actually enforced against them.

IV.   <u>The Claims and Procedural History</u>

Plaintiffs filed their original complaint on September 18, 2020.  <u>See</u> doc. no. 1.  They filed their amended complaint on February 12, 2021.  <u>See</u> doc. no. 14.  The amended complaint brings five counts.  In Count I, plaintiffs allege that the ordinance is unlawful because the City lacks authority to enact an ordinance requiring citizens to wear face masks or coverings and because the ordinance is preempted by the Governors' COVID-19 emergency orders.  In Count II, plaintiffs allege that the ordinance and Emergency Orders 63, 74, and 81 ("the orders") violate their rights to freely exercise their religions under the Federal and State Constitutions.  In Count III, plaintiffs allege that the ordinance and the orders violate their rights to freedom of speech under the Federal and State Constitutions. In Count IV, plaintiffs allege that the ordinance and the orders violate their rights to procedural due process under the Federal Constitution.  Finally, in Count V, plaintiffs allege that the ordinance and the orders violate their rights of free assembly under the Federal and State Constitutions.

Defendants filed the instant motions to dismiss the amended complaint on February 26, 2021.  Plaintiffs subsequently filed their objections, to which defendants thereafter replied.  On June 12, 2021—after defendants' motions were fully briefed and ripe for adjudication—the Governor's declaration of a state of emergency due to COVID-19 expired.  See N.H. Exec. Ord. 2021-10 (May 28, 2021);NHPR Staff, *After More than One Year, Gov. Sununu Will Let State of Emergency Expire*, NEW HAMPSHIRE PUBLIC RADIO (June 10, 2021), available at https://www.nhpr.org/nh-news/2021-06-10/after-more-than-one-year-gov-sununu-will-let-state-of-emergency-expire; see also Rodríguez-Ramos, 685 F.3d at 37; Fed. R. Evid. 201.  As of that date, all the Governor's COVID-19 emergency orders terminated, as did the ordinance.  See RSA 4:45, III; doc. no. 16-2 § 66-171(*l*).  The parties have not briefed the effect of the state of emergency's expiration on plaintiffs' claims or defendants' motions to dismiss.

## DISCUSSION

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014) (quoting U.S. Const. Art. III, § 2).  This case-or-controversy requirement "is crucial in maintaining the 'tripartite allocation of power set forth in the Constitution.'"  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474 (1982)).  As Chief Justice Marshall recognized long ago, "[i]f

the judicial power extended to every question under the constitution it would

involve almost every subject proper for legislative discussion and decision . . . .  The

division of power among the branches of government could exist no longer, and the

other departments would be swallowed up by the judiciary." Id. (brackets and

emphasis omitted) (quoting 4 Papers of John Marshall 95 (C. Cullen ed. 1984)).

From the time of Chief Justice Marshall through the present day, the Supreme

Court has consistently recognized that "[n]o principle is more fundamental to the

judiciary's proper role in our system of government than the constitutional

limitation of federal-court jurisdiction to actual cases or controversies." Spokeo, Inc.

v. Robins, 578 U.S. 856, 136 S. Ct. 1540, 1547 (2016) (quoting Raines v. Byrd, 521

U.S. 811, 818 (1997)); accord, e.g., Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408

(2013).

　　　The doctrine of standing emanates from the case-or-controversy requirement;

it "developed . . . to ensure that federal courts do not exceed their authority as it has

been traditionally understood." Spokeo, 136 S. Ct. at 1547; see also Clapper, 568

U.S. at 408 (standing requirement "serves to prevent the judicial process from being

used to usurp the powers of the political branches").  "The doctrine limits the

category of litigants empowered to maintain a lawsuit in federal court to seek

redress for a legal wrong." Spokeo, 136 S. Ct. at 1547.  Given the doctrine's import

both in defining the federal judiciary's constitutional subject-matter jurisdiction and

in maintaining the careful system of checks and balances set forth by the framers,

courts "have always insisted on strict compliance with this . . . standing requirement." Byrd, 521 U.S. at 819.

"The party invoking federal jurisdiction bears the burden of establishing standing . . . ." Clapper, 568 U.S. at 411-12 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). The plaintiff "must plead 'sufficient factual matter to plausibly demonstrate standing to bring the action.'" Perez-Kudzma v. United States, 940 F.3d 142, 145 (1st Cir. 2019) (brackets omitted) (quoting Gustavsen v. Alcon Labs., Inc., 903 F.3d 1, 7 (1st Cir. 2018)).

To establish standing, a plaintiff must show, among other things, that it has suffered an "injury in fact" that is both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), 528 U.S. 167, 180-81 (2000); accord, e.g., Drewniak v. U.S. Customs and Border Prot., Civ. No. 20-cv-852-LM, 2021 WL 1318028, at *10 (Apr. 8, 2021). The "injury in fact" requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" Susan B. Anthony List, 573 U.S. at 158 (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). "An allegation of future injury may" satisfy the imminence prong of the injury in fact requirement "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" Id. (quoting Clapper, 568 U.S. at 409, 414 n.5). "[A]llegations of possible future injury," on the other hand, "are not sufficient." Clapper, 568 U.S. at 409 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)).

Defendants contend that the amended complaint "lacks any whiff of an allegation" that plaintiffs have been harmed or imminently will be harmed in a concrete and particularized way by the ordinance or the orders. They argue that, while plaintiffs generally object to the lawfulness of the ordinance and orders, mere disagreement with these measures does not constitute an injury in fact. Plaintiffs respond that they have demonstrated standing because the amended complaint plausibly alleges that they face a particularized and imminent threat of future prosecution under the ordinance and orders.

"In certain circumstances, 'the threatened enforcement of a law' may suffice as an 'imminent' Article III injury in fact." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List, 573 U.S. at 158-59). When an individual is subject to a "sufficiently imminent" threat of enforcement, "an actual arrest, prosecution, or other enforcement is not a prerequisite to challenging the law." Susan B. Anthony List, 573 U.S. at 158-59. To show a pre-enforcement injury in fact, the plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the [law's] operation or enforcement." Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). "Allegations of a subjective 'chill' are not an adequate substitute," even when a plaintiff seeks to strike down a law on First Amendment grounds. Id. (quoting Laird v. Tatum, 408 U.S. 1, 13-14 (1972)); see, e.g., Reddy, 845 F.3d at 502 (plaintiffs' allegation that they feared prosecution under a challenged law failed to

confer standing where plaintiffs failed to allege that conditions precedent to enforcement were satisfied or likely to be satisfied).

In Bechade v. Baker, the District Court of Massachusetts considered whether a plaintiff had standing to challenge the lawfulness of that State's mask mandate. See Bechade v. Baker, Civ. Action No. 20-11122-RGS, 2020 WL 5665554, at *1-3 (D. Mass. Sept. 23, 2020).  The complaint alleged that the mask mandate forced "people" to wear masks and rendered "individuals" subject to punishment but did not "allege that [plaintiff] has personally been forced to wear a mask or to require her employees to wear a mask on any occasion." Id. at *2.  At most, the complaint "suggest[ed] that her injury is the general threat of fine that she faces for noncompliance with the mask mandate." Id. at *3.  The court had little trouble concluding that this undifferentiated and ambiguous threat of prosecution was insufficiently particular; "[e]very resident of Massachusetts faces this same general threat of enforcement, and [plaintiff] fails to plead any individual desire or intention to violate the mask requirement which might distinguish her from other residents." Id.

Plaintiffs' amended complaint mirrors the Bechade complaint in all relevant respects.  Plaintiffs allege generally that the ordinance and the orders: "restrict them from engaging in church services"; "require[ ] Plaintiffs [to] cover their mouths in public"; "forbid [plaintiffs] and other citizens from expressing themselves in a clear way"; "prevent Plaintiffs and other citizens from expressing their disagreement with the measures"; "prevent [plaintiffs and other citizens] from

16

choosing whether or not to wear a face mask or covering"; and "forbid [plaintiffs] and other citizens from assembling and expressing their grievances in a clear way." Doc. no. 14 ¶¶ 143, 160, 167, 173.  Plaintiffs do not identify any concrete, specific instance in which they will be required to do, or prevented from doing, any of these things.  They merely state what they believe the ordinance and orders require them (and others) to do and object to compliance with those perceived requirements.

To the extent the amended complaint identifies any threat of enforcement, the threat is no different than that faced by the general public.  Such generalized threats do not satisfy the requirement that plaintiffs' injury be concrete and particularized.  See Valley Forge, 454 U.S. at 482-83; Bechade, 2020 WL 5665554, at *3; see also Defenders of Wildlife, 504 U.S. at 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

Nor do plaintiffs' allegations satisfy the imminence prong of the injury in fact requirement.  It is notable that the only allegation in the amended complaint specific to the plaintiffs' conduct concerns their organization of and attendance at a rally protesting the City's and Governor's respective mask mandates.  See doc. no. 14 ¶ 128.  Plaintiffs allege that they organized and participated in a rally on August 15, 2020, in Keene to protest the laws they seek to challenge in this very lawsuit. More than 100 people attended the rally (including the plaintiffs), and most

individuals there did not wear face masks or coverings (including the plaintiffs).

Plaintiffs do not allege that they or others like them were discouraged from

organizing or attending the rally.  They do not allege that anyone was threatened

with enforcement of the challenged measures for attending this rally.  See Clapper,

568 U.S. at 411 (explaining that plaintiffs' failure to offer evidence that they had

been surveilled under challenged surveillance law substantially undermined

standing).  They do not even allege that they subjectively feared enforcement of the

ordinance or orders for participating in the protest.  It appears from the plaintiffs'

own complaint that the measures they challenge have had no effect on their

conduct.  This strongly suggests they have suffered no injury in fact.  See Reddy,

845 F.3d at 503 (plaintiffs lacked standing to bring First Amendment challenge

where, among other things, plaintiffs acknowledged that the challenged law had not

affected their expressive activities).

        Similarly, plaintiffs have not identified a history of past enforcement, either

as to themselves or any other persons.  "In assessing the risk of prosecution as to

particular facts, weight must be given to the lack of a history of enforcement of the

challenged statute to like facts . . . ."  Blum, 744 F.3d at 798.  Plaintiffs point out

that Emergency Order 65 provides for imposition of criminal and civil penalties for

persons who violate emergency orders.  See N.H. Emer. Ord. 65; see also RSA 21-

P:47 (2013).  That the orders are enforceable, however, does not mean they have a

history of being enforced.  Plaintiffs—as the parties with the burden of

demonstrating standing, see Clapper, 568 U.S. at 411-12—fail to allege that the

orders have a history of enforcement.  Nor do they allege that the City has enforced the ordinance.  To the contrary, plaintiffs' own allegations show that the ordinance and orders were <u>not</u> enforced at their August 2020 protest.  If anything, plaintiffs' allegations suggest these measures have a history of non-enforcement.

Plaintiffs contend that the First Circuit's opinion in <u>N.H. Right to Life Political Action Committee v. Gardner</u> supports the notion that they have standing. Plaintiffs are incorrect.  In <u>N.H. Right to Life</u>, the plaintiff, a political action committee, sued to strike down certain statutory limitations on campaign expenditures, and sough both declaratory and injunctive relief.  See <u>N.H. Right to Life Pol. Action Comm. v. Gardner</u>, 99 F.3d 8, 10-11 (1st Cir. 1996).  The plaintiff also sought a preliminary injunction that would enjoin the law's enforcement as to "three sets of expenditures which it intended to make" in connection with an upcoming primary election.  <u>Id.</u> at 11-12.  For example, the plaintiff averred that it planned to spend $900 on an advertisement in a specific edition of the New Hampshire Right to Life Committee's newsletter.  <u>See</u> <u>id.</u> at 12.  The defendants— the New Hampshire Secretary of State and the Attorney General—took the position that the expenditures at issue in the motion for preliminary relief would not run afoul of the challenged laws, that the plaintiff therefore lacked standing to seek the requested relief, and that the requested preliminary injunction should be denied on that basis.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Friends of the Earth</u>, 528 U.S. at 185 (explaining that the plaintiff "must demonstrate standing separately for each form of relief sought"). The trial court agreed that plaintiffs lacked standing.  <u>See</u> <u>N.H. Right to Life</u>, 99

F.3d at 12.  But rather than simply deny the plaintiff's motion, the court took the additional step of dismissing the suit in its entirety, sua sponte, for lack of subject-matter jurisdiction.  See id.

On appeal of the district court's dismissal, the First Circuit explained that, while standing determinations are always reviewed de novo, "the court of appeals must take an extra step" when a case is dismissed sua sponte for lack of standing. Id.  Specifically, the court must "scrutinize[e] the proceedings carefully to make certain that the plaintiff has had a fair opportunity to put its best foot forward."  Id.

The First Circuit ultimately held that the trial court was correct to focus on the plaintiff's standing to obtain the preliminary relief sought in denying the plaintiff's motion for a preliminary injunction; that motion was focused on obtaining a ruling that would permit plaintiff to make three sets of specific expenditures, and the defendants conceded that those expenditures would not run afoul of the statute. See id. at 16.  However, the trial court erred by dismissing the case in its entirety sua sponte.  In dismissing at the preliminary injunction stage, the trial court "effectively denied [the plaintiff] any opportunity to develop its evidence and arguments" with respect to whether it had standing to seek declaratory or injunctive relief for expenditures not yet at issue.  Id.  That the plaintiff may have lacked standing to pursue preliminary relief as to certain expenditures did not compel a conclusion that the plaintiff lacked standing to seek other forms of relief on the basis of other expenditures.  See id.

Because the district court dismissed the action on its own motion, the First Circuit "scrutinize[d] the entire record" closely.  Id.  The record disclosed that the plaintiff was "an organization whose very purpose [was] to make political expenditures.  It has done so for more than a decade, and it intends to do so in the future."  Id.  Moreover, the plaintiff typically directed all of its fundraising efforts toward political advocacy, and while certain of the plaintiffs' expenditures might not run afoul of the challenged expenditure limit, many of its "outlays, past and prospective, at least arguably [fell] within" the challenged statute's ambit.  Id.  It was thus "highly probable that [the plaintiff] will at some point find itself either in violation of a statute that takes direct aim at its customary conduct or be forced to self-censor."  Id.  Finding a credible threat of future prosecution on these facts, the First Circuit held that the plaintiff had standing.  See id. at 17.

In contrast to N.H. Right to Life, plaintiffs here have had a full and fair opportunity to respond to defendants' standing challenge.  The Governor first challenged plaintiffs' standing in a motion to dismiss the original complaint.  See doc. no. 11-1.  Plaintiffs filed an amended complaint after reviewing the Governor's motion with reason to suspect that their standing would likely be challenged again.  See doc. no. 12 ¶¶ 3-5 (assented-to motion to continue pretrial conference) (noting that plaintiffs planned to file an amended complaint in response to defendants' motions to dismiss and that plaintiffs "anticipated the Defendants will file dispositive motions in response to the Amended Complaint").  Plaintiffs also filed a written objection responding to the Governor's renewed argument that the case

should be dismissed for lack of standing.  See doc. no. 18.  In sum, a major concern animating the First Circuit in N.H. Right to Life—that the plaintiff had been deprived of an opportunity to demonstrate standing—is absent in this case.

Moreover, unlike the political action committee in N.H. Right to Life, plaintiffs here have not identified any particular action they have taken or plan to take (other than the August 2020 protest, which does not suggest an imminent prosecution for the reasons discussed above) that may run afoul of the ordinance or order.  Nor do plaintiffs allege that their "very purpose" is to engage in the type of conduct—going maskless in public and at large gatherings—that is proscribed by the ordinance and orders.  The N.H. Right to Life plaintiff was a political action committee whose existence was premised upon taking the types of actions proscribed by the challenged law.  Unlike the plaintiff in that case, here the plaintiffs are not on a collision course with the ordinance and orders.[6]

For all of these reasons, plaintiffs have failed to allege an injury in fact; they therefore lack standing to pursue this action.  Because the court concludes it lacks

---

[6] The First Circuit appeared to state in N.H. Right to Life that courts should "assume a credible threat of prosecution" whenever a plaintiff challenges a "non-moribund" law that restricts expressive activity in the absence of "compelling" evidence of non-enforcement.  N.H. Right to Life, 99 F.3d at 15.  Later cases from both the Supreme Court and First Circuit have made clear that courts should not relieve plaintiffs of their burden to demonstrate an actual or imminent injury.  See Blum, 744 F.3d at 799 (citing Clapper, 568 U.S. at 409); see also Sever v. City of Salem, 390 F. Supp. 3d 299, 308 n.6 (D. Mass. 2019) (concluding that, to the extent N.H. Right to Life held that courts should assume a credible threat of prosecution, that holding cannot be reconciled with Clapper, Reddy, and Blum).

subject-matter jurisdiction over plaintiffs' claims, it does not consider defendants' additional arguments for dismissal of those claims.  See Ne. Erectors, 62 F.3d at 39.

Before concluding, however, the court notes the following.  The Governor's COVID-19 state of emergency ended on June 12, 2021, after plaintiffs filed their amended complaint.  All emergency orders still in effect as of that date expired when the state of emergency did, see RSA 4:45, III, and the ordinance "automatically and immediately" terminated, doc. no. 16-2 § 66-171(*l*).  While the expiration of the challenged measures would seem to substantially undermine—if not entirely refute—plaintiffs' claims of imminent enforcement, the court cannot consider factual developments subsequent to the amended complaint's filing when assessing standing.  See Lujan, 504 U.S. at 569 n.4; Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (standing is assessed based on facts in existence "at the commencement of the case").

These developments do, however, give rise to a colorable argument that plaintiffs' claims are moot.  See Calvary Chapel of Bangor v. Mills, ___ F. Supp. 3d ___, 2021 WL 2292795, at *8-10 (D. Me. June 4, 2021); Goodwin v. C.N.J., Inc., 436 F.3d 44, 48 (1st Cir. 2006) ("Whether a plaintiff has a sufficient stake in the litigation is measured, at the commencement of the action, through the doctrine of standing.  Whether subsequent events have dissipated the plaintiff's interest is assessed through the prism of mootness." (citation omitted)).  Given the court's conclusion that plaintiffs lack standing, however, it need not further consider this possibility.

23

## CONCLUSION

Defendants' motions to dismiss (doc. nos. 15 and 16) are granted.  Plaintiffs' amended complaint (doc. no. 14) is dismissed.  The clerk of court is directed to enter judgment and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 10, 2021

cc: Counsel of Record